# Illinois Official Reports

## Appellate Court

*In re Javaun I.*, 2014 IL App (4th) 130189

| | |
|---|---|
| Appellate Court Caption | In re: JAVAUN I., a Minor, THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, v. JAVAUN I., Respondent-Appellant. |
| District & No. | Fourth District<br>Docket No. 4-13-0189 |
| Filed | February 14, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | On appeal from a finding that respondent juvenile was guilty of home invasion, attempted aggravated robbery and criminal trespass to a residence, the appellate court determined that the evidence was sufficient to establish respondent's guilt beyond a reasonable doubt and even though respondent forfeited his claim that the trial court did not follow the statutory requirements in sentencing him to the Department of Juvenile Justice, it could not be said that the trial court abused its discretion in finding that sentencing respondent to the Department of Juvenile Justice was the least restrictive alternative; however, the conviction for criminal trespass to a residence was vacated pursuant to the one-act, one-crime rule because that conviction was based on the same act as the home invasion conviction. |
| Decision Under Review | Appeal from the Circuit Court of Vermilion County, No. 12-JD-226; the Hon. Claudia S. Anderson, Judge, presiding. |
| Judgment | Affirmed in part and vacated in part; cause remanded with directions. |

| Counsel on Appeal | Michael J. Pelletier, Karen Munoz, and Amber Corrigan, all of State Appellate Defender's Office, of Springfield, for appellant. |
|---|---|
| | Randall Brinegar, State's Attorney, of Danville (Patrick Delfino, David J. Robinson, and Linda Susan McClain, all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |
| Panel | JUSTICE POPE delivered the judgment of the court, with opinion. Justices Turner and Steigmann concurred in the judgment and opinion. |

## OPINION

¶ 1     On January 28, 2013, respondent, Javaun I., was found guilty of home invasion, attempt (aggravated robbery), and criminal trespass to a residence. On March 4, 2013, the trial court sentenced respondent to an indeterminate sentence in the Illinois Department of Juvenile Justice (DOJJ). Respondent appeals, arguing the following: (1) the State presented insufficient evidence to prove his guilt beyond a reasonable doubt; (2) the court erred as a matter of law in sentencing him to DOJJ without first following the statutory requirements found in section 5-750(1) of the Juvenile Court Act of 1987 (Act) (705 ILCS 405/5-750(1) (West 2012)); and (3) respondent's adjudication for both home invasion and criminal trespass to a residence violate the one-act, one-crime rule because both charges were based on the same physical act. We affirm in part, vacate in part, and remand with directions.

¶ 2                                I. BACKGROUND

¶ 3     On December 12, 2012, the State filed a petition for adjudication of wardship against respondent (born March 28, 1997), charging him with home invasion (causing injury) (720 ILCS 5/12-11(a)(2) (West 2010)), attempt (aggravated robbery) (720 ILCS 5/8-4(a), 18-5 (West 2010)), and criminal trespass to a residence (720 ILCS 5/19-4(a)(2) (West 2010)). That same day, the trial court ordered respondent detained. On December 21, 2012, respondent filed notice of an alibi defense, claiming he was at home when the alleged offenses were committed.

¶ 4     On January 28, 2013, respondent's trial was held. The State first called Khaylee B., age 12, to testify. On the night of December 9, 2012, at around 10 or 11 p.m., she was sitting on the couch at her home watching television when someone knocked on the back door. Her mother (Jennifer V.), her sisters (Kaitlin B., Cassidy B., and Kristen B.), her brother (Kody B.), and Kristen's boyfriend (Darius H.) were also in the house. The doors and windows were all closed. She opened the back door and recognized Mario A. standing outside. Although Mario

A. said he was alone, she slammed and locked the door when she saw shadows outside. About 10 or 15 minutes later, she heard another knock on the door. Kody B. answered the door. She then saw her brother, Kody, running through the house with Mario A. holding onto him. She testified she only saw two other people enter the home, Joey I. (Jo-Jo) and Marcus A. She put her head down after they entered the house.

¶ 5        Khaylee testified, "They was carrying a gun." No one said anything but Mario A., who was yelling, "Where's the money? Give me the money." At that time, Joey I. and Marcus A. went to Kaitlin's room, where she was sleeping. Kaitlin yelled, "Jo-Jo, you better get the F*** out of my house. I'm calling the police." Joey I. whispered something to Mario A., and then they ran from the house.

¶ 6        Khaylee knew Joey I. (Jo-Jo) because he used to hang out in the apartment building where she used to live. Mario A. rode the school bus with her. She did not recognize respondent as one of the intruders. She testified she was scared because the intruders had guns. When they first came into the house, she took a "real quick look" and then put her head down. She only looked up one other time.

¶ 7        Kody B., age 15, testified he was playing a video game on the night in question. His sisters, parents, and "Kilo and Darius" were also at the house. His sisters, Cassidy and Kaitlin, were in their rooms sleeping. Kody opened the back door from the kitchen after hearing someone knock. (He had not heard the earlier knock, nor had he seen Khaylee open the door 10 to 15 minutes earlier.) Mario A. and some others forced their way into the house, pushing Kody back through the kitchen, the living room, and then the dining room. Mario A. maced Kody's arms and eyes, causing a burning sensation.

¶ 8        Kody testified four people forced their way into the house; some were armed. Mario A. stood over him in the dining room. One of the intruders yelled, "Give me the money." An intruder he did not know stood behind Darius. The other two intruders, respondent and Joseph I. (a.k.a. Joey I. and Jo-Jo) went to Kaitlin's room. Kaitlin got up and started yelling at the intruders, who ran out of the house. He recognized respondent because respondent and respondent's brother used to visit Kody's neighbor when they lived in an apartment complex. Kody testified he identified respondent, Mario A., and Joseph I., in a photo lineup.

¶ 9        On cross-examination, Kody testified he only saw one gun and respondent was the last intruder to enter the house. He did not remember what respondent was wearing. On the night of the incident, he told the responding officer Mario A., Joseph I., and respondent, whom he identified as Jo-Jo's little brother, were three of the intruders.

¶ 10        Officer Scott Damilano of the Danville police department testified he met with Kody B. and Kaitlin B. for a photo lineup. Kody and Kaitlin both identified one of the intruders as Jo-Jo's brother. Kody told him Jo-Jo's brother had a BB gun. Kaitlin also told Damilano one of the suspects was holding a BB gun.

¶ 11        Officer Kevin Atkinson of the Danville police department testified he responded to the home. He spoke with Khaylee B., Kody B., Kaitlin B., Jennifer V., Darius H., and Kilan C. Kody B. had been pepper-sprayed in the eyes. Kody told him three people entered the house.

¶ 12    Kaitlin B. testified she was asleep when the incident in question began. She woke up when Joseph I. and respondent, who were wearing "hoodies" with bandanas over their mouths, came into her room yelling, "Give me the money." She recognized Joseph I. and yelled at him, "Jo-Jo, Jo-Jo, what the heck are you guys doing in my house? You need to get the F*** out." Joseph I. and respondent, who had a gun, then ran into the living room. She told her mom to call the police. She saw four people who had entered the house. After she came out of her bedroom, Joseph I. whispered something to one of the other intruders and all four of them ran from the house. Kaitlin B. identified respondent as Jo-Jo's little brother to the responding officer.

¶ 13    After the State rested, respondent presented an alibi defense. Desiree I., age 17, respondent and Joseph I.'s sister, testified her two brothers were home on the evening of December 9, 2012. She went to bed at about 3 a.m. and did not recall anyone leaving the house that evening. Respondent went to sleep in the living room at 9:30 p.m. She testified four dogs also live at the house and bark every time someone enters or leaves the home. She did not hear the dogs bark on the night in question.

¶ 14    Donald Murrell, Jr., respondent's uncle, also testified he was at the home he shares with respondent and respondent's family on the night in question. According to his testimony, respondent was at home that evening, and Murrell did not hear anyone leave the house around 10 or 11 p.m. However, on cross-examination, he admitted he could not be sure no one left the residence.

¶ 15    Christina I., respondent's mother, testified respondent was in Jo-Jo's room with his dog and then went to sleep at about 9:30 p.m. on the night in question. She did not hear anyone leave that evening. According to her testimony, the dogs wake her up if anyone leaves.

¶ 16    Respondent testified he was at his home on the night in question and did not leave. He went to sleep at 9:30 p.m. because he had to get up at 6 a.m. to get ready for school. He knew of no reason why Kaitlin B. would say he was involved in the home invasion other than the fact he got into an argument with her cousin six months earlier.

¶ 17    The trial court found respondent guilty on all three counts. On February 27, 2013, a probation officer's social history investigation report was filed with the trial court. The report showed this was not respondent's first contact with the court system. The report noted a petition for adjudication of wardship was filed in Vermilion County on June 23, 2010, alleging respondent committed a battery (720 ILCS 5/12-3(a)(2) (West 2008)). On August 2, 2010, respondent pleaded guilty to the charge. The report showed respondent had four different contacts with the police after his plea. The report also indicated respondent reported smoking marijuana every other day. The report offered the following recommendation:

    "Should the Court impose a sentence of probation, the following community resources may aid in developing a supervision plan for the respondent's rehabilitation including the standard terms and conditions:

        [1.] Drug and alcohol testing with treatment if necessary (Prairie Center.)
        [2.] Actively participate in any form of counseling already involved in or recommended by Probation (Center for Children's Services, Crosspoint, etc.)

- 4 -

[3.] Continue to take medication as prescribed or if recommended and go to doctor appointments as directed.

[4.] No contact with co-respondents[,] Mario A[.] and Marcus A[.]

[5.] No involvement with any individual/individuals on probation, parole, Continuance Under Supervision, court supervision, conditional discharge, etc.

[6.] Follow strict curfew."

¶ 18    On February 28, 2013, a supplemental social history investigation report was filed with the trial court. The supplemental report noted respondent had seen Kari Hoskins from the Prairie Center while detained. Hoskins diagnosed him with cannabis abuse and documented his need for residential, dual-diagnosis treatment. The Prairie Center youth assessment also suggested respondent could become unstable without 24-hour supervision as a result of his emotional/behavioral problems. A juvenile detention center report filed with the court on March 4, 2013, noted respondent's overall conduct had improved.

¶ 19    On March 4, 2013, at the dispositional hearing in this case, the trial court noted it had reviewed the February 27 presentence report, the February 28 addendum to the presentence report, and the juvenile detention center report. The State recommended an indeterminate DOJJ sentence based on the offenses at issue and the fact respondent had a prior case where he received a continuance under supervision. The State noted respondent's crimes had escalated from a battery to a home invasion and attempted aggravated robbery and that respondent has problems with authority and cannabis. Further, the State argued a community-based sentence would be inappropriate because it had been tried before. However, if the court was not inclined to incarcerate respondent, the State recommended a five-year period of probation with substance abuse treatment and six months of total home confinement.

¶ 20    Respondent's counsel pointed out respondent had successfully completed a continuance under supervision for battery, his conduct at the detention center had improved since he was placed on the correct medication for his attention deficit hyperactivity disorder, and he was fully cooperating with his schooling at the juvenile detention center. Counsel also argued treatment at a residential dual-diagnosis facility had been recommended and would be more appropriate than incarceration. Counsel also agreed the State's recommendation of five years' probation with six months of total home confinement would be appropriate. Respondent's counsel suggested a commitment to DOJJ for 60 days for a psychological and psychiatric evaluation.

¶ 21    In sentencing respondent, the trial court stated he committed a serious offense–home invasion–and had contacts with other juvenile delinquents. While observing respondent completed his prior continuance under supervision, the court stated respondent did not even attempt to refute the State's assertion he did not comply with recommended counseling that might have helped him. The court also noted respondent had a history of disciplinary problems at school and admitted abusing drugs. In addition, the court stated respondent showed no remorse for his actions. The court also noted respondent could get drug and mental health treatment in DOJJ.

¶ 22    In the trial court's written judgment and sentence, the court found reasonable efforts could not prevent or eliminate the need to remove respondent from his home. The court signed a

preprinted order noting it had received and reviewed evidence concerning efforts made to find a less restrictive alternative to commitment in DOJJ and had considered and reviewed factors, including the following: (1) respondent's age; (2) prior delinquency, petitions, and adjudications; (3) assessment results; (4) respondent's educational background (including educational assessments and services, achievement, and disciplinary history); (5) respondent's physical and mental health (including compliance with treatment); (6) community-based services respondent had received, his compliance with those services, and the results of those services; and (7) the services respondent could receive in DOJJ. The court found (1) commitment necessary to protect the public from the effects of respondent's criminal activity and (2) secure confinement in the DOJJ was in respondent's best interest and welfare.

¶ 23    This appeal followed.

¶ 24                              II. ANALYSIS
¶ 25                        A. Sufficiency of the Evidence
¶ 26    Respondent first argues the State did not present sufficient evidence he was present the night several people illegally entered the residence in question. We will reject a challenge to the sufficiency of the evidence if any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *People v. Wheeler*, 226 Ill. 2d 92, 114, 871 N.E.2d 728, 740 (2007). An appellate court will not retry a defendant when considering a challenge to the sufficiency of the evidence. *Id*. Further, the evidence is considered in the light most favorable to the prosecution. *Id*. at 116, 871 N.E.2d at 741.

¶ 27    "The trier of fact is best equipped to judge the credibility of witnesses, and due consideration must be given to the fact that it was the trial court and jury that saw and heard the witnesses." *Id*. at 114-15, 871 N.E.2d at 740. However, "a conviction will be reversed where the evidence is so unreasonable, improbable, or unsatisfactory that it justifies a reasonable doubt of defendant's guilt." *Id*. at 115, 871 N.E.2d at 740. Our review "must include consideration of all of the evidence, not just the evidence convenient to the State's theory of the case." *Id*. at 117, 871 N.E.2d at 742. But this does not require "a point-by-point discussion of every piece of evidence as well as every possible inference that could be drawn therefrom." *Id*.

¶ 28    Respondent first focuses on the testimony of Khaylee B., who testified she did not see respondent in her home and further testified she only saw three people enter her home. However, her testimony does not establish respondent was not in the home. Her testimony only establishes she did not see respondent in her home. She testified she was scared and had her head down during most of the encounter, which could explain why she did not see respondent.

¶ 29    Further, the State did not rely solely on Khaylee B.'s testimony; it also presented the testimony of two other witnesses who were inside the home, Kody B. and Kaitlin B. Both of these witnesses testified respondent was one of the intruders in their home. Respondent points out some inconsistencies between what Kody B. and Kaitlin B. told the police soon after the incident and their testimony at the adjudicatory hearing. Respondent also points out some inconsistencies between the testimony of Kody B. and Kaitlin B. However, respondent does

not argue either of these witnesses ever contradicted themselves with regard to whether respondent was in their home.

¶ 30    The trial court was able to see all of the witnesses testify and make credibility determinations. The trial court did not find the testimony from respondent's family members that respondent was home the entire night credible. The trial court also apparently was able to reconcile any inconsistencies in the testimony of Khaylee B., Kody B., and Kaitlin B. and find respondent was one of the intruders in their home. This was a finding a rational trier of fact could have made. The evidence supported the trial court's finding of guilt.

¶ 31                                B. DOJJ Sentence

¶ 32    Respondent next argues the trial court erred in sentencing him to DOJJ without first following the statutory requirements found in section 5-750(1) of the Act (705 ILCS 5/750(1) (West 2012)). With regard to the requirements found in section 5-750(1)(A) to (G), the record contained sufficient information on these factors for the court to consider before sentencing respondent to DOJJ. Further, the court's written sentencing order states it considered these factors prior to sentencing respondent.

¶ 33    In *In re Raheem M.*, 2013 IL App (4th) 130585, ¶ 50, this court stated:

> "Prior to committing a juvenile to the DOJJ, a trial court must have before it evidence of efforts made to locate less restrictive alternatives to secure confinement and the court must state the reasons why said efforts were unsuccessful. This is not some *pro forma* statement to be satisfied by including the language of the statute in a form sentencing order. Actual efforts must be made, evidence of those efforts must be presented to the court, and, if those efforts prove unsuccessful, an explanation must be given why the efforts were unsuccessful."

This court found the record in *Raheem M.* clearly established the trial court erred by failing to follow the mandate of section 5-750 prior to committing the juvenile to the DOJJ. *Id.*

¶ 34    In *Raheem M.*, the record contained "no evidence regarding efforts to identify a less restrictive alternative to secure confinement, either in the social history report or at the sentencing hearing." *Id.* ¶ 47. The juvenile was not assessed or evaluated in any manner to determine whether community-based services could eliminate any perceived need to incarcerate him. *Id.* This court also noted the record did not reflect any community-based services had been provided to the minor for the trial court to judge the juvenile's compliance with those services, even though the court's form sentencing order stated it had reviewed community-based services provided to respondent and his compliance with those services. *Id.* Further, this court stated:

> "[T]he court was not given, nor did it ask for, any evidence regarding efforts made to find a less restrictive alternative to secure confinement. Pursuant to the statute, the trial court had to consider evidence [(emphasis in original)] efforts were made to find a less restrictive alternative to secure confinement before it could sentence respondent to the DOJJ. While the court stated it had to look at some alternative to secure confinement,

- 7 -

*no evidence was presented to the court about any efforts made to find possible alternatives.*" (Emphases added unless otherwise noted.) *Id.* ¶ 49.

¶ 35 This court found the failure to require and consider evidence of less restrictive alternatives to DOJJ, evidence of efforts made to locate less restrictive alternatives, and evidence explaining why those efforts were unsuccessful before sentencing the juvenile to DOJJ constituted such a serious error we excused forfeiture based on the second prong of the plain-error analysis. *Id.* ¶ 52.

¶ 36 In *Raheem M.*, this court was troubled by the trial court's lack of compliance with section 5-750 for a number of reasons. First, the court had no evidence of less restrictive alternatives and did not require any evidence of less restrictive alternatives to DOJJ. *Id.* ¶ 54. Second, not only did the court not have any evidence with regard to less restrictive alternatives, the court did not have any information about possible alternatives. Third, at a hearing on a motion to reconsider sentence, after defense counsel presented an alternative to incarceration, the court failed to explain why the alternative was not acceptable. *Id.*

¶ 37 Further, this court also noted other concerns it had with actions the trial court took during the case and during the sentencing hearing. First, although Raheem M. was not detained prior to trial and the State had not asked for Raheem M. to be detained after trial, the court immediately detained him after his trial as a matter of immediate and urgent necessity. *Id.* ¶ 56. This where the offense would have been a simple battery had not the victim, who suffered a minor injury and was not the intended victim of the battery, been a school monitor. *Id.* ¶ 58. Further, the only background information the court had on respondent was the fact he was expelled from school as a result of the incident. *Id.* ¶ 56. Finally, this court was troubled by the trial court's focus on Raheem M.'s father's criminal history while sentencing Raheem M. *Id.* ¶ 60.

¶ 38 Like Raheem M., respondent in this case forfeited the sentencing error he now complains of by failing to raise the issue in the trial court. However, the circumstances in this case are easily distinguishable from those in *Raheem M.* Any issue not raised at trial and in a posttrial motion is forfeited on appeal. *In re M.W.*, 232 Ill. 2d 408, 430, 905 N.E.2d 757, 772 (2009). However, we can consider the issue if it falls within the plain-error doctrine.

¶ 39 In *People v. Rathbone*, 345 Ill. App. 3d 305, 310, 802 N.E.2d 333, 338 (2003), this court recognized some appellate court opinions have asserted sentencing errors are reviewable as plain error when they involve a misapplication of law because the right to be sentenced according to the law is substantial in that it affects a defendant's fundamental right to liberty. However, this court rejected that approach because it is inconsistent with the law set forth by our supreme court in *People v. Reed*, 177 Ill. 2d 389, 686 N.E.2d 584 (1997), its underlying principles, and legislative intent. "If *all* matters related to a 'misapplication of law' at sentencing affect a defendant's fundamental right to liberty and are thus reviewable as plain error, then the plain[-]error exception essentially swallows the forfeiture rule, rendering meaningless the requirement contained in section 5-8-1(c) of the Unified Code and enforced by the supreme court in *Reed*." (Emphasis in original.) *Rathbone*, 345 Ill. App. 3d at 311, 802 N.E.2d at 338. When determining whether a forfeited sentencing error can be reviewed, we still must conclude the evidence was closely balanced or the error was so serious it deprived

defendant of a fair sentencing hearing. However, the plain-error rule will not apply if a clear or obvious error did not occur. *People v. Walker*, 232 Ill. 2d 113, 124, 902 N.E.2d 691, 697 (2009).

¶ 40    The briefs in this case were filed prior to this court's decision in *Raheem M.* As a result, the parties did not have the opportunity to analyze this case pursuant to that decision. Unlike in *Raheem M.*, any error in this case was not so clear and obvious as to satisfy the plain-error doctrine. As previously noted, the trial court in *Raheem M.* had no evidence before it of any efforts to identify a less restrictive alternative to secure confinement. *Raheem M.*, 2013 IL App (4th) 130585, ¶ 47.

¶ 41    In this case, the parties provided the court with alternatives to incarceration. For example, the supplemental social history investigation report filed on February 28, 2013, noted Kari Hoskins from Prairie Center had diagnosed respondent with cannabis abuse and found him "in need of residential dual-diagnosis treatment." Respondent's counsel argued residential dual-diagnosis treatment would be more appropriate for respondent than incarceration. The State also recommended a five-year term of probation with substance abuse treatment and total home confinement for six months if the court chose not to incarcerate respondent. Respondent's counsel agreed this would be an appropriate sentence. Counsel further noted respondent's mother and father could supervise any period of home confinement.

¶ 42    Granted, pursuant to this court's direction in *Raheem M.*, the trial court ideally would have inquired whether the parties had located any residential facilities that would accept respondent and, if not, inquired into the efforts the parties made in this regard. However, the trial court's failure to do so does not constitute clear and obvious error based on the record in this case.

¶ 43    In this case, the trial court was presented with alternatives to incarceration. We cannot say the trial court did not consider those less restrictive alternatives to incarceration. We also cannot say the trial court abused its sentencing discretion in finding DOJJ was the least restrictive alternative based on the facts in this case. Respondent was convicted of serious offenses, and this was not his first encounter with the juvenile court. Respondent showed no remorse for his crime, had a drug problem, could become unstable at any time, and needed constant supervision because of his emotional and behavioral problems.

¶ 44                           C. Criminal Trespass to a Residence

¶ 45    Respondent next argues his adjudications for both home invasion and criminal trespass to a residence violate the one-act, one-crime rule because both charges were based on the same physical act, unlawfully entering a home. Multiple convictions are improper if based on the same physical act. *People v. Artis*, 232 Ill. 2d 156, 161-68, 902 N.E.2d 677, 681-85 (2009). The State concedes respondent's conviction for criminal trespass to a residence should be vacated. See *People v. Harvey*, 211 Ill. 2d 368, 391, 813 N.E.2d 181, 196 (2004). Although respondent failed to preserve this issue in the trial court, we can consider this error under the second prong of the plain-error rule as the error affects the integrity of the judicial process. *Id.* at 389, 813 N.E.2d at 194. We accept the State's concession and vacate respondent's conviction for criminal trespass to a residence.

¶ 46                                         III. CONCLUSION

¶ 47            For the reasons stated, we affirm in part, vacate in part, and remand with directions to vacate respondent's criminal trespass to a residence conviction and sentence and for the issuance of an amended sentencing judgment reflecting the same.

¶ 48            Affirmed in part and vacated in part; cause remanded with directions.