NOTICE
This Order was filed under Supreme
Court Rule 23 and is not precedent
except in the limited circumstances
allowed under Rule 23(e)(1).

2021 IL App (4th) 200455-U

NO. 4-20-0455

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
February 1, 2021
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| *In re* A.V., a Minor | ) | Appeal from the |
| (The People of the State of Illinois, | ) | Circuit Court of |
| Petitioner-Appellee, | ) | McLean County |
| v. | ) | No. 19JD9 |
| A.V., | ) | |
| Respondent-Appellant). | ) | Honorable |
| | ) | Jason J. Chambers, |
| | ) | Judge Presiding. |

JUSTICE DeARMOND delivered the judgment of the court.
Presiding Justice Knecht and Justice Harris concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The appellate court affirmed, finding the minor's commitment to the Illinois
Department of Juvenile Justice was not excessive, did not violate the
proportionate penalties clause, and defense counsel was not ineffective for failing
to cross-examine one of the juvenile victims.

¶ 2    In January 2019, the State charged respondent, A.V., with 16 counts of various

offenses against three juvenile victims. Seven of the counts alleged criminal sexual abuse, four

counts alleged unlawful restraint, four counts alleged criminal sexual assault, and one count

alleged cyberstalking. Respondent was 17 years old at the time of the detention hearing and the

victims' ages were 15, 16, and 18 years of age. The State dismissed four of the counts before

proceeding to a bench trial. At trial in February 2020, respondent was convicted of 11 counts and

adjudged to be a delinquent minor. At sentencing, respondent was sentenced to an indeterminate

term in the Illinois Department of Juvenile Justice (IDJJ), not to exceed his twenty-first birthday.

¶ 3        On appeal, respondent argues the sentence to IDJJ violated the proportionate penalties clause of the Illinois Constitution, the sentence to IDJJ was excessive, and trial counsel was ineffective for failing to cross-examine one of the juvenile victims. We affirm.

¶ 4                                    I. BACKGROUND

¶ 5        In January 2019, the State charged respondent with 16 criminal offenses against three victims. Seven of the counts were criminal sexual abuse (720 ILCS 5/11-1.50(a)(1) (West 2016)), four of the counts alleged unlawful restraint (720 ILCS 5/10-3 (West 2016)), four counts alleged criminal sexual assault (720 ILCS 5/11-1.20(a)(1) (West 2016)), and one count alleged cyberstalking (720 ILCS 5/12-7.5(a)(1) (West 2016)). After several pretrial hearings to address discovery issues, the matter was set for trial in September 2019.

¶ 6        When the case was called for trial in September 2019, the State sought to bar a defense witness or alternatively continue the trial, claiming defense counsel's late disclosure of Dr. Terry Killian as a defense witness, along with his psychiatric report and defendant's notice raising a new defense—insanity—was untimely, violative of the victims' right to timely disposition under the Rights of Crime Victims and Witnesses Act (725 ILCS 120/1 *et seq.* (West 2018)), and prejudicial to the State. The trial court ordered defense counsel to provide the State with all notes and reference materials used by the doctor in compiling his report. Between September and December, the State obtained additional discovery and sought its own psychiatric expert. In December, the State moved to continue the trial, indicating it retained two experts, Dr. Lawrence Jeckel and Dr. Robert Hanlon. Dr. Jeckel reviewed the defense expert's report, conducted an evaluation of respondent, and requested additional testing by a neuropsychologist. Dr. Hanlon then conducted the testing requested and submitted a report; however, Dr. Jeckel

needed additional time to incorporate these findings into his report. By agreement of the parties, the bench trial was continued to January 2020.

¶ 7    Before the start of trial, the State dismissed 4 of the counts and proceeded on the remaining 12 counts against respondent. The trial court also discussed with respondent and his counsel a last-minute plea offer tendered by the State, which was rejected by respondent.

¶ 8    A. Bench Trial

¶ 9    1. *A.S.*

¶ 10    A.S. was 19 years old and attending college when she testified. She attended the same high school as respondent and started her freshmen year in 2015. She resides in McLean County with her parents and a brother. She said she first met respondent after her swimming practice when she was a sophomore. They met because their respective athletic practices were in essentially the same place after school each day. Respondent messaged her on social media asking for her phone number, which she provided, and they began to communicate back and forth via text messages. They became "really good friends," and although they communicated by text messaging and attended one class together, A.S. did not "hang out" with respondent outside of school because she was aware her parents "didn't really like him." After a period of time when they did not communicate, she said they began texting again. Throughout her sophomore year, communication between them broke off several times, she said, primarily because of what she described as "mean things" he would say, or the anger he exhibited from time to time. She testified she was "afraid of him." By October of her sophomore year, she said they became friends again, although A.S. told respondent "he needed to work on keeping his temper in check." In October 2017, respondent asked her to meet him at his car in the high school parking lot after her swim practice. According to A.S., upon entering respondent's car he said he wanted

to talk with her about something, but he was waiting until another student left the area. When A.S. told respondent she needed to leave and attempted to exit the vehicle, respondent locked her door by means of an electronic lock on his side and "grabbed me from behind" which she described as reaching with one hand around her waist and with the other he "grabbed my face." He then started kissing her. She told him "no," but he did not stop. He put his hands up her shirt and felt her breasts over her sports bra. She was not sure how long this lasted but estimated "around five minutes." As she attempted to exit the car, respondent told her "not to tell anyone or there would be consequences." He then unlocked her door and she exited. A.S. testified she sat in her car and started crying. A.S. said it was one or two weeks later when her brother confronted her after overhearing her crying in her room that she first disclosed some of what had occurred. She testified she was unable to tell him everything until a few months before the trial. She further explained how she was unable to tell her boyfriend or other members of her family until some months before the trial. Sometime after the incident, respondent texted her, saying she was about to be called in to the school office due to respondent's report that her brother was threatening to fight respondent. She then disclosed to school administrators what respondent had done to her in the car. According to A.S., the only action taken by the school was for the assistant principal to tell respondent to stay away from A.S. A.S. testified they both agreed to stop talking to one another, and they blocked each other from their phones. The next semester, they were in class together and she said the friendship began again.

¶ 11　　　　During that summer, she agreed to go on two different hikes with respondent, emphasizing each time there was to be no touching and they were doing so only as friends. On each occasion they drove themselves to the park and left in separate vehicles. Respondent agreed to her conditions. Nothing unusual occurred on the first hike. Prior to the second hike, A.S. said

she had started to feel uncomfortable around respondent and "didn't want to be alone with him." To that end, when they discussed the second hike, she mentioned bringing a friend, respondent objected, and she eventually acquiesced. On the second hike in July 2018, after they found themselves on an unfamiliar path, he grabbed her around the waist from behind. She elbowed him, telling respondent to let her go and he did. He then grabbed her around the waist again with a stronger grip and backed up against a tree with her in front of him. She told him to let her go, but he refused, started kissing her, and put his hands up her shirt and under her bra, touching her breasts. Respondent then put his hands up her shorts and began penetrating her vagina. She told him several times to stop but when it started to hurt, she stopped moving and began to cry. He told her she had to have sex with him or "do oral." She refused, and he took her hand and placed it down his pants forcing her to touch his penis. She pulled her hand away and they started walking. After a phone call from his mother, respondent left her alone in an unfamiliar part of the forest. She eventually found her way back to her car, sat inside and cried, then she went to meet a friend, never telling anyone about what happened until much later. On cross-examination, when asked whether any of these incidents were "consensual," she said in each instance, she told him "no." A.S. said during her senior year, they became friends again and began communicating on the social media forum Snapchat. He expressed to her his desire "to try again" and that they both "could learn together *** how to love each other," but she refused, insisting she wanted to stay with her boyfriend. Respondent then informed her via text he had a gun in his car and sent her a picture of the gun held to his head claiming he was going to kill himself. A.S. said she "started to freak out because I actually thought he would hurt himself." The State admitted a portion of their text messages and a photograph of a pistol recovered pursuant to a search warrant into evidence.

¶ 12        A.S. recalled an incident in October 2018, when respondent became angry with her because she was with her boyfriend at her house, and respondent kept texting her that he was coming to her house, that she knew "what he had in his car," and he sent texts counting down the minutes until his arrival at her home. She was aware when he arrived because she saw his car pass by and heard loud music coming from it. In addition, her brother happened to arrive home and saw respondent there. Through their conversations, A.S. was able to learn respondent was keeping track of her location from the global positioning system on Snapchat. On cross-examination, she stated she disclosed these events to the police almost two years later "[b]ecause [respondent] had done this stuff and I was tired of being quiet about it." On redirect examination, she stated it took her two years to tell the entire story of what respondent did to her because she feared him and was not ready to tell her parents. She said she was afraid of him because, among other threats he made, he threatened to impregnate her and beat up her boyfriend.

¶ 13                                    2. *T.S.*

¶ 14        T.S., A.S.'s brother and a junior in high school, testified he was aware his sister was "going out" with respondent when he was a freshman in the 2017-2018 school year. He knew respondent but was not friends with him or involved in his circle of friends. T.S. recalled one evening when A.S. came home and was crying. He stated A.S. told him "[respondent] had done some things that she didn't like," and as she was crying, she relayed some of the details to him. She told him about the incident after swim practice in respondent's car when he locked the doors and would not let her out. T.S. described how A.S.'s behavior changed during this time and how she became uncommunicative and locked herself in her room frequently. He witnessed respondent sitting outside of their house on the evening A.S. described in her testimony.

According to T.S., his sister told him "on multiple occasions" that "she couldn't get away from" respondent. Admitting, "we're not fans of each other," T.S. said he and respondent were sending threatening text messages back and forth even before he became aware of the incident with his sister. At one point, he said, they planned on fighting in a nearby park before the school administration found out. He said respondent sent him a text message the evening of the same day he was called into the office, indicating he had a gun in his car and was "coming for me."

¶ 15                                    3. *L.M.*

¶ 16          L.M., A.S's boyfriend at the time of trial, testified A.S. told him about the sexual assault in the woods "a little after we had started dating" in "late summer of 2018." He said initially she did not tell him everything, but eventually he received "the whole story." L.M. described the incident in October 2018 when he was at A.S.'s house and respondent showed up uninvited. He said respondent was texting with A.S., telling her "he was going to come over there and proceed to shoot me." L.M. said respondent was sending "Snapchats" giving him the impression he was on his way to A.S.'s home. Although he never saw respondent that night, he "did see a vehicle circle around the house a few times," and when A.S.'s brother came home he said respondent had been there. On cross-examination, he stated he has never texted or had any form of electronic communication with respondent. He also explained A.S. disclosed more details about what respondent did to her as time went by.

¶ 17                                    4. *C.C.*

¶ 18          C.C. was 18 at the time of the trial and a senior in high school, while also taking college courses online. She recalled first meeting respondent during her freshman year, 2016-2017. The first time she spoke with him was over Snapchat. She acknowledged sending him pictures of her "half-naked body" wearing only underwear. She knew his friend group and

had seen him around school before, but she did not remember speaking to him in person until a school event during her sophomore year. She and respondent communicated by Snapchat after that. Sometime later respondent replied to her request for a ride to school from a remote parking lot, indicating he would pick her up from the parking lot as she had requested.

¶ 19      That Monday morning in February 2018, C.C. arrived in the parking lot, parked behind respondent, and got in the passenger side of his car. After some small talk, respondent began kissing her. She said it was a little uncomfortable, but she kissed him back. As he continued to kiss her, he pulled down her pants to her knees, and she said she "kind of froze, but *** didn't tell him to stop or anything." Respondent started putting his fingers inside of her vagina, and C.C. "didn't say anything, but *** was kind of starting to freeze up and *** stopped kissing him." She said she was too embarrassed to tell him to stop or to say no, so she just waited. At some point, he stopped and drove them to school. She kept sending messages to him on social media throughout the day because she was "kind of confused and I was embarrassed" but "just pretended that it was okay." She acknowledged there was nothing she said or did to indicate that what happened was not consensual.

¶ 20      The next day, respondent sent her a picture of the road and said he was on his way to pick her up. She drove to the parking lot where she again entered respondent's car. C.C. testified she noticed respondent "seemed really quiet" when she got into the car and she felt awkward. Eventually class time was approaching so she asked if they were going to leave. Respondent said, "I want to do something first." She said she felt like "it happened quick." He started to kiss her, and she started to kiss back, until she felt uncomfortable and pushed him away, saying, "[n]o, this is—I'm not doing this; I don't want to do this." He tried to calm her down and kiss her again, but she said she would just leave, went to grab the door handle, and

respondent "tensed up and reached over and pushed the lock down." C.C. said she felt like her comment "made him frustrated or angry." She said she started to panic as he started to kiss her again. Although she tried to move away, she felt "out of control" and "stuck." Respondent kept telling her, "[i]t's okay; it's okay." He pulled her pants down and inserted his fingers inside her vagina, and she said she felt "numb and confused" and "felt completely frozen and scared." She started crying, and said, "[p]lease, stop." She said at one point he asked if she wanted to get in the backseat and she said no. He then asked if she would perform oral sex on him and she said no. He "seemed annoyed" but stopped and drove them to school in silence. She said she "was really afraid of what had just happened."

¶ 21        Once they arrived at school, as C.C. was "fumbling, like trying to get my pants up," he said, "[t]hank you" and got out, leaving her in the car. She eventually texted her boyfriend, telling him "it was [respondent] and that like he locked me in his car and that it wasn't consensual." Only after her boyfriend threatened to tell her mother if she did not, C.C. texted her mother to pick her up, telling her only that "something bad happened with a boy." When she got into her mother's car she immediately began crying and told her what happened. She left school about a month after the incident because she was experiencing "flashbacks and panic attacks and disassociation," and she began to inflict self-harm and have suicidal ideations. She was diagnosed with post-traumatic stress disorder (PTSD) and felt like she was seeing respondent everywhere she went. She described the physical effects of the assault as soreness in her vagina, some bleeding, and she had some bruises on her thighs. The State admitted photographs depicting the bruising on her thighs taken two weeks after the incident. C.C. eventually told the police what happened in September, approximately seven months after the incident, because, "I

had had enough." She said she could not "keep being controlled by someone else *** because of something that happened to me."

¶ 22    C.C. described how she learned A.S. had a similar experience with respondent and also recounted how one of her best friends informed her there was another girl, G.M., who had a similar occurrence with respondent, and the two began communicating on social media.

¶ 23                    5. *M.B.*

¶ 24    M.B., C.C.'s mother, also testified. In February 2018, C.C. sent her a text in the morning stating, "something happened and I'm scared and I need to go home." When M.B. arrived at school, she said C.C. "was shakey [*sic*]. She was crying. She looked scared." C.C. related what occurred between her and a boy in his car in the parking lot, but she did not identify the assailant at that time. M.B. said C.C. initially "wanted to go back to some sense of normal" but was having panic attacks, which lasted for two years. Her behavior changed dramatically, she was unable to sleep, and she was tired all the time. She was unable to drive a car because of the panic attacks, and although she had previously loved school and was a good student, she eventually had to switch to homebound school and her grades dropped dramatically.  At the time of the trial, C.C. was seeing a counselor, a psychiatrist, and taking medication for anxiety, panic attacks, and depression. M.B. helped C.C. obtain a no stalking order against respondent because he began appearing at her church. She said C.C. has had suicidal thoughts and has been to the emergency room because of self-harming behavior.

¶ 25                    6. *T.M.*

¶ 26    T.M. was 17 years old and is C.C.'s boyfriend. He recounted how C.C. disclosed to him in February 2018 that something happened but did not provide specifics other than to say she had asked for a ride, got into someone's car, and wanted to leave but could not. He said he

could tell she was upset, she looked sad, and her voice was "quivering" when she told him. He encouraged her go home and tell someone what happened. On cross-examination, he noted she was acting very unusual on the day she disclosed what happened in the car. He said based on the way she was acting, "I assumed something happened."

¶ 27                                    7. *C.H.*

¶ 28            C.H. was 16 years old and attending Leroy High School at the time of the trial. She met G.M., another victim in this case, during the summer of 2018, and the two became "pretty close" friends. Their friendship ended in March or April 2019. C.H. said in August 2018, she had a video call with G.M., who appeared "shocked" and "upset." She said G.M.'s face "was kind of red and she had some tears" and appeared short of breath. G.M. told C.H. that respondent had just raped her, and G.M. called her immediately after respondent left. Although this testimony was not accepted by the court substantively under the excited utterance exception, on redirect examination C.H. confirmed, without objection, G.M. told her respondent used force during the assault. On cross-examination, C.H. acknowledged G.M. sometime later said she did not say "no" to having sex with respondent.

¶ 29                                    8. *G.M.*

¶ 30            G.M. testified she was 16 years old and a sophomore in high school. She lived in the town of Leroy before moving to Bloomington in September 2019. She met respondent though social media in the summer of 2018. After knowing each other only through social media, and only for a month, she said respondent asked her to send him some pictures of her naked, but she refused. Respondent, however, sent her unsolicited pictures of his erect penis. In August 2018, she invited him over to her home in Leroy at about 11:30 p.m. Two of her friends and her mother were present at the time, although her mother was sleeping and unaware of their

presence. When her friends left at approximately 12:30 a.m., respondent remained, and they sat on her bed "listening to music." Eventually, respondent pulled her towards him and started to move his hands on her chest and lower body over her clothing. She asked him what he was doing, and his response was, "it's fine." As he began touching her breasts and her vagina over her clothes, she pulled his hand away. He stopped, but then put his hands underneath her clothes, touching her breasts, and attempted to penetrate her vagina with his fingers. She told him to stop and pulled away from him. Respondent then put her on her back and got on top of her, pinning her hands down above her head with one hand, while he pulled her pants down with the other. She struggled to get away, repeatedly telling him to "stop" when respondent pulled her pants down. He pulled his pants down and began having sex with her. She said she was "[s]cared" and "completely terrified." Afterwards, he put his clothes back on, said, "That was fun," and left at approximately 2 a.m. She called her friend, C.H., on the video application Facetime about five minutes after he left and told her what happened.

¶ 31        When she next saw respondent at a high school football game, she started "panicking, kind of like freaking out, and I started crying." In January 2019, Detective Karen DeRosa from the Normal police department contacted her, and she told the detective about what happened. She said she had not reported it earlier because she was the one who had "snuck" people over to her house and knew her mother would be mad. She admitted on cross-examination that she invited respondent and was aware her mother was sleeping in the next room during the assault. G.M. testified about how she used to be involved in sports and student council at school, but after the incident, she lost interest in extracurricular activities because she "just wanted everything to stop" and started to isolate herself. Afterwards she was prescribed medication for depression and anxiety, diagnosed with PTSD, and started to see counselors and

- 12 -

psychiatrists. She said she misses a lot of school because of her inability to function and has made three suicide attempts. She moved to Bloomington to get away from Leroy, because remaining in Leroy at her house reminded her of the incident. G.M. said the only other time she saw respondent between the night of the incident and court was when he appeared outside the window during a girl's sleepover at C.C.'s house.

¶ 32 The State called respondent's father to testify about respondent's height, weight, and physical features. On cross-examination, defense counsel asked about the neck injury respondent sustained in a swimming accident in the summer of 2017 and how it affected his strength, mobility, and athletic activity for a number of months.

¶ 33 9. *Kendra DeRosa*

¶ 34 Kendra DeRosa, a 16-year veteran of the Normal Police Department, was assigned to the criminal investigation division (CID) as a juvenile detective. She had 600 hours of training specifically related to crimes against children and about 150 hours of training in forensic interviewing. She said she was trained in what she referred to as the "child-first protocol" of asking non-leading questions of children in order to allow them to describe experiences in their own words. She had conducted approximately 166 such interviews. Of the approximately 550 cases assigned to her since starting in CID, she said approximately 203 of those involved juvenile sex offenses. She also works with the McLean County Children's Advocacy Center (CAC) as part of a multi-disciplinary team and has designed and conducted training in the investigation of child sex offenses.

¶ 35 Detective DeRosa described how her involvement with this case began in February 2018, when C.C.'s father contacted the Normal Police Department to report her sexual assault. He initially asked questions about how the investigation would proceed and later

- 13 -

informed the department "they had decided that they didn't want to do anything further with it." When she later spoke with C.C.'s mother, Detective DeRosa learned the first name of the alleged perpetrator. She then called the school resource officer to view security footage on the day C.C. alleged respondent assaulted her in the car. The resource officer later reported the video showed respondent and C.C. entering the school through different doors at approximately the same time. In September 2018, C.C.'s parents contacted DeRosa saying respondent had contacted C.C. on several occasions, which scared her, and she was now willing to be interviewed and move forward with the investigation. C.C. disclosed the sexual assault and Detective DeRosa subpoenaed phone records from respondent and C.C., and through search warrants, she was able to view extensive contacts between them on social media. She also discovered that G.M. was another potential victim. She contacted G.M. and her mom and set up an interview for her at the CAC, where G.M. disclosed how respondent sexually assaulted her. DeRosa also learned from C.C. that A.S. had also been assaulted by respondent, contacted A.S., and interviewed her at the CAC as well. Based on A.S.'s statement, she obtained a search warrant and seized respondent's phone and a gun provided by respondent's father.

¶ 36       Respondent was initially uncooperative with the investigation, ultimately turning himself in to the Normal police department in January 2019. While DeRosa was taking respondent to be booked in, respondent made an unsolicited comment about how he "figured this was coming" and "what he did was stupid."

¶ 37       Discussing her experience with victims of sexual assault, DeRosa said it was very common with victims, especially juvenile victims, to blame themselves and delay the reporting of a sexual assault. According to DeRosa, all three victims delayed reporting the assault, and all three have experienced anxiety, sleeplessness, self-blame, and have become more withdrawn. All

- 14 -

three also expressed to DeRosa how afraid they were of respondent and fearful of what he would do to them.

¶ 38    At the close of the State's evidence, defense counsel moved for a directed finding on all counts. The trial court granted the motion as to count 3K, a count of criminal sexual assault as to G.M. which alleged sexual penetration with his fingers. The trial court found there was evidence of touching but not of penetration. Respondent elected not to testify, and the defense rested.

¶ 39    The trial court summarized the testimony of all three victims, A.S., C.C., and G.M., found each of the victims credible, and found all remaining allegations proved. The court then adjudicated respondent minor delinquent and set sentencing for June 2020. Respondent filed a motion for a new trial in March 2020, which was addressed immediately preceding the sentencing hearing. Respondent alleged: (1) the State failed to prove him guilty of the allegations beyond a reasonable doubt, (2) the court erred in denying respondent's motion for a directed finding at the close of the State's evidence, and (3) the State failed to prove every material allegation beyond a reasonable doubt.

¶ 40                    B. Sentencing Hearing

¶ 41    Before proceeding to sentencing, the trial court heard arguments and denied defendant's motion for a new trial. In aggravation, the State introduced a document entitled "Illinois Department of Juvenile Justice Comprehensive Youth Development and Reentry Planning Model," which contained an outline of the programs and activities located within the facilities of the IDJJ and demonstrating the access to programs respondent would have if sentenced to IDJJ. The State also introduced Dr. Hanlon's neuropsychological evaluation of respondent conducted before trial in November 2019. Dr. Hanlon was critical of the reports by

defense experts Dr. Killian and Dr. Willett in a number of respects. The State also presented written victim impact statements from each of the three victims, as well as from various family members.

¶ 42 In mitigation, respondent called Dr. Terry Killian, the forensic psychiatrist respondent earlier obtained to investigate a possible insanity defense. Dr. Killian explained his process of reading and obtaining information from various sources, including respondent's mother's journal entries, the police reports, and respondent's medical records. He also conducted a lengthy interview of respondent and his mother. Dr. Killian rendered an earlier medical opinion respondent was "not guilty by reason of insanity" prefaced on the assumption respondent's head injury from the pool accident had been "fairly severe." He later acknowledged this came primarily from reports by respondent and his mother. However, his later review of Dr. Hanlon's report, a person he believed to be "a very, very fine psychologist and honest," and the information upon which Dr. Hanlon relied caused Dr. Killian to modify his opinion, recognizing the severity of the injury was not as previously reported. His opinion at the time of sentencing was that respondent's neurological testing reports revealed "apparent residual damage, but mostly normal functioning" and "two-and-a-half years after the head injury *** testing results were even better." He testified it was very common for individuals to have personality and behavior issues after head injuries, which can "manifest in a wide variety of abnormal and aggressive behavior and then frequently that gets better with time." Dr. Killian said he also reviewed the sex offender evaluation and found nothing wrong with it. He admitted on cross-examination respondent may have "a somewhat abnormal view" of sex and sexual relations, although he said, "[i]t may just be immaturity."

¶ 43 Respondent also called three family friends to testify essentially as character witnesses. All three agreed they would be there to support respondent if given a term of probation.

¶ 44 Defendant next called his sister and mother, also as character witnesses. His sister discussed his head injury and asserted he was different afterwards. She also testified about her relationship with respondent and her observations about him. Respondent's mother also discussed the pool accident and the effect she believed it had on his personality and behavior. She also discussed respondent's current personality and work habits in general. Defense counsel also submitted a number of letters in support of respondent.

¶ 45 The State recommended a sentence to IDJJ for an indeterminate term. Defense counsel argued that a community-based sentence was more appropriate in order to help treat respondent's issues.

¶ 46 After respondent's statement in allocution, the trial court acknowledged its duty, when fashioning a sentence in juvenile court, to "focus on rehabilitation and public safety." The court also indicated it considered the evidence presented at trial and sentencing, the letters in support, the social investigation report, the sex offender evaluation, the IDJJ comprehensive youth development plan, as well as testimony and reports of the experts in deciding what the appropriate disposition should be. The trial court specifically noted the sex offender evaluation characterized respondent as a low-moderate to moderate recidivism risk—something different than that represented by Dr. Killian, the defense expert. The court then outlined the various statutory factors it was to consider in imposing sentence—whether the parents were unfit or unable to care for, protect, train, or discipline respondent, or were unwilling to do so. Although the court expressly found they were not unwilling, the court agreed with the State that they were

unable to adequately monitor respondent's behavior. The court also found placement was necessary to ensure the protection of the public based on the conduct proved. Next, the court acknowledged its obligation to make findings as required to determine whether secure placement was "necessary" after considering respondent's age, criminal background, results of any assessments, educational background, physical, mental, and emotional health, viability of community-based services, and whether the services available in IDJJ would meet respondent's needs. Having done so, the court concluded that "removal from the home is in the best interest of the minor and minor's family and the public," also concluding less restrictive alternatives were not available and "[t]hat community-based interventions are not possible due to significant public safety risk."

¶ 47       The trial court then sentenced respondent to an indeterminate term at IDJJ, not to exceed his twenty-first birthday, and ordered him to register as a sex offender.

¶ 48       This appeal followed

¶ 49                                  II. ANALYSIS

¶ 50                              A. Proportionate Penalties

¶ 51       Addressing respondent's constitutional challenge first, respondent argues the indeterminate sentence to IDJJ, not to exceed his twenty-first birthday, violates the eighth amendment and the proportionate penalties clause of the Illinois Constitution. U.S. Const., amend. XIII; Ill. Const. 1970, art. I, § 11. We disagree.

¶ 52       Article I, section 11 of the Illinois Constitution (otherwise referred to as the proportionate penalties clause) provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. "A defendant can raise a proportionate penalties

- 18 -

challenge on the basis that the penalty for a particular offense is too severe under the 'cruel or degrading' standard or that the penalty is harsher than the penalty for a different offense that contains identical elements." *People v. Williams*, 2015 IL 117470, ¶ 9, 43 N.E.3d 941 (citing *People v. Sharpe*, 216 Ill. 2d 481, 521, 839 N.E.2d 492, 517 (2005)).

¶ 53     In the first instance, the challenger must establish the penalty would constitute cruel and unusual punishment under the eighth amendment of the United States Constitution (U.S. Const., amend. VIII), which our supreme court and this district have both noted is coextensive with the proportionate penalties clause of our constitution. See *In re Rodney H.*, 223 Ill. 2d 510, 518, 861 N.E.2d 623, 628 (2006); *In re Maurice D.*, 2015 IL App (4th) 130323, ¶ 25, 34 N.E.3d 590.

¶ 54     Although respondent's brief correctly notes the proportionate penalties clause does not apply to juvenile delinquency proceedings, he argues instead the sentence, coupled with the claimed failure by the court to properly consider certain factors in mitigation, somehow brings it within the ambit of cruel and unusual punishment. Respondent does so without any citation to authority supporting his position. Argument must "contain the contentions of the appellant and the reasons therefor, with citation of the authorities and the pages of the record relied on." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Furthermore, "[m]ere contentions, without argument or citation to authority, do not merit consideration on appeal." *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d) 111151, ¶ 12, 969 N.E.2d 930. " 'The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument.' " *Enbridge Pipeline (Illinois), LLC v. Hoke*, 2019 IL App (4th) 150544-B, ¶ 43, 123 N.E.3d 1271 (quoting *Hall*, 2012 Il App (2d) 111151, ¶ 12). However, where the appellate court finds the flaws were not "so serious as to interfere with [the appellate

court's] ability to understand and adjudicate [the] case," the court may address the issue presented. *State Farm Mutual Automobile Insurance Co. v. Burke*, 2016 IL App (2d) 150462, ¶ 22, 51 N.E.3d 1082. In spite of the deficiencies of respondent's brief, we elect to address the issue because it can be dealt with summarily.

¶ 55    Our supreme court has determined the proportionate penalties clause and the eighth amendment's cruel and unusual punishment clause do not apply to juvenile proceedings initiated by a petition for adjudication of wardship. *Rodney H.*, 223 Ill. 2d at 520-21; see also *In re Dave L.*, 2017 IL App (1st) 170152, ¶ 36, 80 N.E.3d 694; *In re Deshawn G.*, 2015 IL App (1st) 143316, ¶ 52, 40 N.E.3d 762; *Maurice D.*, 2015 IL App (4th) 130323, ¶ 26; *In re A.P.*, 2014 IL App (1st) 140327, ¶ 13, 14 N.E.3d 689.

¶ 56    The court reasoned a petition for adjudication of wardship is neither criminal in nature nor a direct action by the State to inflict punishment upon a juvenile, and thus, neither the cruel and unusual punishment clause nor the proportionate penalties clause applies in such cases. *Rodney H.*, 223 Ill. 2d at 520-21; see also *Deshawn G.*, 2015 IL App (1st) 143316, ¶ 52 (stating "neither the eighth amendment nor the proportionate penalties clause apply to juvenile proceedings initiated by a petition for adjudication of wardship because 'a juvenile adjudication of wardship was not criminal in nature and did not impose "punishment" within the meaning of the eighth amendment and proportionate penalties clause' " (quoting *In re Isaiah D.*, 2015 IL App (1st) 143507, ¶ 52, 35 N.E.3d 88)). See also *In re Derrico G.*, 2014 IL 114463, ¶ 101, 15 N.E.3d 457; *People ex rel. Birkett v. Konetski*, 233 Ill. 2d 185, 208, 909 N.E.2d 783, 799 (2009). Having failed to direct us to any authority to the contrary, we choose to follow the direction of our supreme court and find the proportionate penalties clause is inapplicable to respondent's juvenile adjudication and reject this argument on appeal.

¶ 57                                    B. Excessive Sentence

¶ 58          In connection with respondent's proportionate penalties argument, respondent

contends the trial court erred when it failed to consider all the factors in mitigation and sentenced

him to a "grossly excessive" sentence by committing him to IDJJ.  We disagree.

¶ 59          The Juvenile Court Act of 1987 (Juvenile Court Act) (705 ILCS 405/1 *et seq.*

(West 2018)) gives the trial court wide discretion when determining the appropriate sentence

after a juvenile is adjudicated delinquent. *In re R.D.M.*, 313 Ill. App. 3d 989, 992, 731 N.E.2d

421, 424 (2000). A trial court has authority to place a minor on probation or conditional

discharge, in detention, or commit him or her to IDJJ. See 705 ILCS 405/5-710 (West 2018). We

review *de novo* whether the trial court complied with the requirements of the Juvenile Court Act

in sentencing a juvenile to IDJJ. *In re Ashley C.*, 2014 IL App (4th) 131014, ¶ 22, 8 N.E.3d 1142.

However, "[a] trial court's dispositional order is entitled to great deference and will not be

reversed absent an abuse of discretion." *In re M.Z.*, 296 Ill. App. 3d 669, 674, 695 N.E.2d 587,

591 (1998).

¶ 60          Before the trial court can commit a minor to the IDJJ, it must follow the mandates

of section 5-750 of the Juvenile Court Act (705 ILCS 405/5-750 (West 2018)). See *In re Raheem

M.*, 2013 IL App (4th) 130585, ¶ 50, 1 N.E.3d 86. To make a finding that secure confinement is

necessary, section 5-750(1) requires the court to review the following individualized factors:

          "(A) Age of the minor.

          (B) Criminal background of the minor.

          (C) Review of results of any assessments of the minor,

          including child centered assessments such as the CANS [(Child

          and Adolescent Needs and Strengths)].

(D) Educational background of the minor, indicating whether the minor has ever been assessed for a learning disability, and if so what services were provided as well as any disciplinary incidents at school.

(E) Physical, mental and emotional health of the minor, indicating whether the minor has ever been diagnosed with a health issue and if so what services were provided and whether the minor was compliant with services.

(F) Community based services that have been provided to the minor, and whether the minor was compliant with the services, and the reason the services were unsuccessful.

(G) Services within the Department of Juvenile Justice that will meet the individualized needs of the minor." 705 ILCS 405/5-750(1) (West 2018).

¶ 61 Respondent argues the sentence imposed was excessive because the trial court committed him to the IDJJ without considering how respondent's cognitive abilities were affected by a head injury, that respondent was employed, had support from family and friends, and it failed to consider "many characteristics of [r]espondent." Further, respondent argues the trial court erred by finding respondent's parents were "unwilling" to care for, protect, and discipline the minor. In essence, respondent claims the sentence was excessive because the trial court did not properly consider the evidence in mitigation.

¶ 62 Compliance with section 5-750(1) will be shown if the record contains evidence the trial court considered the statutorily required factors and the trial court's commitment order

reflects it. *In re Javaun I.*, 2014 IL App (4th) 130189, ¶ 32, 5 N.E.3d 304. The statute does not require the court to explicitly evaluate on the record the individualized factors required by the Juvenile Court Act. See 705 ILCS 405/5-750(1) (West 2018) ("Before the court commits a minor to the [IDJJ], it shall make a finding that secure confinement is necessary, following a review of the following individualized factors[.]"). Thus, the only question is whether "the record contained sufficient information on these factors for the court to consider before sentencing respondent to [IDJJ]." *Javaun I.*, 2014 IL App (4th) 130189, ¶ 32. We find the record contained more than sufficient information for the court and that the trial court outlined that information as it related to the statutory factors to be considered.

¶ 63          In its preliminary remarks, the trial court recognized the serious nature of the offenses; however, it explained how, in a juvenile proceeding, it was bound to "focus on rehabilitation and public safety." The court made mention of the fact that "strong punishment" was not to be a major factor in sentencing and that any ruling it made was "not based on trying to focus on strong punishment." The court reiterated the various available sources of information it had when fashioning a sentence: the State's exhibit outlining the resources provided in IDJJ, the testimony at sentencing, evidence presented at trial, letters of support, the social investigation report, the sex offender evaluation, testimony from Dr. Killian, and the report authored by Dr. Hanlon. The court then listed the statutory factors it was to consider in imposing sentence— whether the parents were unfit or unable to care for, protect, train, or discipline respondent, or were unwilling to do so. Contrary to respondent's argument, the court did not find that they were unwilling; however, the court agreed with the State that they were *unable* to adequately monitor respondent's behavior, citing various examples in the evidence indicating respondent had the independence to engage in the behaviors he did. Having previously noted his age at sentencing,

the court pointed out, if given probation, respondent could stop living with his parents and thereby lessen the amount of control or guidance they could provide. After finding it was bound to protect the public from consequences of the criminal activity of respondent, the court outlined the mandatory statutory factors: respondent's age, his criminal background, the results of the social investigation report, his sex offender evaluation, his educational background, his physical, mental, and emotional health, the viability of any community-based services, as well as respondent's family support structure, and whether IDJJ could meet his needs. Respondent argues the trial court did not properly consider respondent's head injury and the issues related thereto. In fact, the court listed the services available to address those issues in IDJJ: "mental health and behavior evaluations and treatment, including psychiatric diagnoses and treatment needs." The trial court also noted, however, the repeated references to respondent's "lack of remorse, lack of empathy toward others," and his designation as a low to moderate risk to reoffend. Coupled with the actual offenses for which he was found guilty, the trial court concluded that "community-based interventions are not possible due to significant public safety risk." Indeed, both the court's commitment order and the record at sentencing confirm the trial court considered all of the statutory factors pursuant to section 5-750 before finding commitment to IDJJ was the least restrictive alternative.

¶ 64　　　　It is clear from the record that the trial court acknowledged respondent had no previous criminal record and might be amenable to rehabilitation. However, it is equally clear the court determined the circumstances and seriousness of the sexual offenses against three different teenage victims and the protection of the public outweighed the minor's rehabilitative potential. Respondent claims he was "achieving rehabilitation" because he was employed and comes from a supportive family. However, respondent fails to support this argument with any statutory or

case authority indicating a trial court is precluded from a sentence to IDJJ if a respondent minor contends or even shows he has been to some degree "rehabilitated" since the commission of the offenses for which he was found guilty. In essence, counsel argues the trial court failed to give his mitigating evidence the weight he believes it should. The evidence considered by the trial court negates this claim. The sex offender evaluation disclosed respondent denied he committed some of the offenses and noted, "he does not seem to be in touch with any significant feelings of guilt, shame or remorse, nor does there seem to be any empathy towards the victims being present at this time." Similarly, the social investigation report, while recognizing respondent has a supportive family and maintains employment, recommended an indeterminate commitment to IDJJ in part because "the [respondent] appears to maintain that the allegations are unfounded; he does not demonstrate an appreciable sense of responsibility or remorse." Dr. Hanlon's report noted respondent's "personality configuration consisted of the following: histrionic personality traits, narcissistic personality features, and obsessive-compulsive personality features. His profile suggested that his interpersonal relationships are often shallow, and he manifests a self-centered indifference to the welfare of others." This was consistent with Dr. Kleppin's sex offender evaluation.

¶ 65     Taking into account the nature and circumstances of the offenses, coupled with the effect of a sentence which could not extend beyond his twenty-first birthday, we fail to see how his sentence was excessive. Respondent was 19 years old by the time he was sentenced and was sentenced to an indeterminate amount of time in IDJJ not to exceed his twenty-first birthday. As a result, even if required to serve his full sentence, he would spend less than two years in IDJJ for what would have otherwise been Class 1 felonies subject to mandatory consecutive sentences totaling 12 to 45 years in prison. See 720 ILCS 5/11-1.20 (West 2016); 730 ILCS 5/5-4.5-30(a),

5-8-4(d)(2) (West 2016). At sentencing, the State introduced the "Illinois Department of Juvenile Justice Comprehensive Youth Development and Reentry Planning Model." The model determines a juvenile offender's length of commitment to IDJJ "by taking into account offense type and programmatic needs" according to the Youth Assessment and Screening Instrument. Thus, depending on his "needs" according to this model, it is probable respondent could be released from IDJJ custody much sooner than his twenty-first birthday. The possibility of early release is further codified under section 5/3-2.5-85(c) of the Unified Code of Corrections (730 ILCS 5/3-2.5-85(c) (West 2018)):

> "[IDJJ] shall establish a process for deciding the date of release on aftercare for every youth committed to [IDJJ] ***. The establishment, adjustment, and final consideration of the target release date shall include consideration of the following factors:
>
> (1) the nature and seriousness of the youth's offense;
>
> (2) the likelihood the youth will reoffend or will pose a danger to the community based on an assessment of the youth's risks, strengths, and behavior; and
>
> (3) the youth's progress since being committed to the Department."

Additionally, a review for aftercare release takes place within the first year of a minor's confinement in IDJJ as the minor is guaranteed to be considered for release "at least 30 days prior to the expiration of the first year of confinement and at least annually thereafter." 730 ILCS 5/3-2.5-85(a)(3) (West 2018).

¶ 66    The trial court also explained the possibility of early release to respondent after sentencing, reiterating the sentence is an "indeterminate sentence" and reminding respondent to

- 26 -

"keep in mind, sometimes the length of time that you spend [in IDJJ] is also determined by that progress that you make. So it's in your best interest to utilize that opportunity."

¶ 67        Considering respondent committed 11 serious felonies against three different juvenile victims, all in a period of 10 months and, on at least two occasions, on school property, we cannot conclude that serving a sentence to IDJJ of less than two years is excessive. The trial court complied with the requirements of the Juvenile Court Act in sentencing a juvenile to IDJJ. See *Ashley C.*, 2014 IL App (4th) 131014, ¶ 22. "A trial court's dispositional order is entitled to great deference and will not be reversed absent an abuse of discretion." *M.Z.*, 296 Ill. App. 3d at 674. We cannot conclude, from this record, the court's decision was an abuse of discretion.

¶ 68                     C. Ineffective Assistance of Counsel

¶ 69        Respondent argues defense counsel was ineffective for failing to cross-examine C.C., one of the victims. We disagree.

¶ 70        A defendant's claim of ineffective assistance of counsel is analyzed under the two-pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *People v. Veach*, 2017 IL 120649, ¶ 29, 89 N.E.3d 366. To prevail on such a claim, "a defendant must show both that counsel's performance was deficient and that the deficient performance prejudiced the defendant." *People v. Petrenko*, 237 Ill. 2d 490, 496, 931 N.E.2d 1198, 1203 (2010). To establish deficient performance, the defendant must show "counsel's performance 'fell below an objective standard of reasonableness.' " *People v. Valdez*, 2016 IL 119860, ¶ 14, 67 N.E.3d 233 (quoting *Strickland*, 466 U.S. at 688). Prejudice is established when a reasonable probability exists that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *People v. Evans*, 209 Ill. 2d 194, 219-20, 808 N.E.2d 939, 953 (2004) (citing *Strickland*, 466 U.S. at 694). A defendant must satisfy both prongs of the *Strickland* standard, and the failure to

satisfy either prong precludes a finding of ineffective assistance of counsel. *People v. Clendenin*, 238 Ill. 2d 302, 317-18, 939 N.E.2d 310, 319 (2010).

¶ 71         In order to prove deficient performance, defendant "must overcome the strong presumption that the challenged action or inaction may have been the product of sound trial strategy." *People v. Bates*, 2018 IL App (4th) 160255, ¶ 47, 112 N.E.3d 657. "Whether and how to conduct a cross-examination is generally a matter of trial strategy." *People v. Sturgeon*, 2019 IL App (4th) 170035, ¶ 83, 126 N.E.3d 703. This is so because the decision whether to engage in cross-examining a witness involves the exercise of counsel's professional judgment. *People v. Pecoraro*, 175 Ill. 2d 294, 326, 677 N.E.2d 875, 891 (1997). Only if defendant can prove trial counsel's approach to cross-examination was objectively unreasonable can he prevail on an ineffective assistance of counsel claim. *Pecoraro*, 175 Ill. 2d at 327. It is not objectively unreasonable if defense counsel fails to cross-examine a witness because any cross-examination would have only reinforced the same information on direct examination. *People v. Leeper*, 317 Ill. App. 3d 475, 483, 740 N.E.2d 32, 39 (2000). Equally important, we are mindful of a defense counsel's dilemma when confronted with any cross-examination of young sexual assault victims. Counsel must decide whether and how to approach such an examination, weighing the benefit to be gained against the possible damage to be caused in the eyes of the trier of fact, be it judge or jury.

¶ 72         The direct examination testimony of C.C. takes up approximately 46 pages of the record detailing two incidents of sexual contact with respondent, one consensual and the other nonconsensual. Her testimony regarding the second incident included details about respondent locking her inside his vehicle after she attempted to leave, forcibly kissing her, pulling her pants down, and digitally penetrating her. Respondent stopped only when she began crying and begged

- 28 -

him to stop. She described to the court the physical consequences of the assault: vaginal soreness, some blood, and visible bruising on her thighs two weeks after the incident. She also outlined in detail the psychological impact respondent's assault had on her. She had to leave school permanently shortly after the incident because of flashbacks and panic attacks, and she began to inflict self-harm and experience suicidal ideations. She was diagnosed with PTSD, prescribed several different medications, and became completely paranoid that she was seeing him everywhere.

¶ 73    Reviewing a cold record, we are obviously unable to observe her emotional expressions and demeanor while relaying how respondent assaulted her and the negative psychological and emotional impact she suffered from the attack. Based on her testimony, it is plausible any questioning of this witness would potentially reinforce her direct examination testimony, thereby allowing the trial court to hear C.C. twice describe the assault and the psychological aftermath. Defense counsel may have realized this from the previous day when cross-examining one of the other victims, A.S. During counsel's cross-examination of A.S., she was able to reference for a second time the assault she suffered in respondent's car, the assault during their hike in the woods, and that respondent sent her a video of himself with a gun.

¶ 74    Equally unable to observe A.S.'s demeanor during her testimony, we note how after defense counsel's cross-examination, the State asked A.S. if she needed a tissue or wanted to take a break. The trial court even stated it was prepared to take a break if needed, before A.S. stated, "it's okay," and indicated she was willing to proceed. Further, based on defense counsel's cross-examination of A.S., the State, on redirect examination, was able to reinforce A.S's direct examination testimony that she was afraid of respondent, and he threatened her and her boyfriend.

¶ 75    Moreover, after C.C.'s direct examination, defense counsel asked for "a little time," indicating he took some time to consider how to handle C.C.'s testimony before opting to forgo cross-examination. Under these circumstances, we cannot say it was unreasonable trial strategy to forgo cross-examination of yet another sexual assault victim as an exercise of counsel's professional judgement. *Pecoraro*, 175 Ill. 2d at 326. It should also be noted that at sentencing, several witnesses mentioned the apparent behavior of respondent during certain unidentified witnesses' testimony, indicating he was "laughing" and "smirking" during testimony. This could not have gone unnoticed by his counsel, and it could just as easily have entered into his decision to forgo certain cross-examination topics or cross-examination in its entirety. The trial court was able to judge the credibility of witnesses, and the minimal benefit to be gained by further cross-examination, as suggested by respondent, may have been outweighed by counsel's recognition the case was being tried before the judge and not a jury. Regardless, we cannot find defense counsel's failure to cross-examine C.C. was objectively unreasonable. *Pecoraro*, 175 Ill. 2d at 327. Because respondent cannot satisfy the first prong of the *Strickland* standard, his ineffective assistance of counsel claim must fail. *Clendenin*, 238 Ill. 2d at 317-18.

¶ 76                                III. CONCLUSION

¶ 77    For the reasons stated, we affirm the trial court's judgment.

¶ 78    Affirmed.