NOTICE
Decision filed 04/01/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 200247

NO. 5-20-0247

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

---

| | | |
|---|---|---|
| *In re* JOHNATHAN T., a Minor | ) | Appeal from the |
| | ) | Circuit Court of |
| (The People of the State of Illinois, Petitioner-Appellee, v. Johnathan T., Respondent-Appellant). | ) | Massac County. |
| | ) | |
| | ) | |
| | ) | No. 18-JD-5 |
| | ) | |
| | ) | Honorable |
| | ) | Todd D. Lambert, |
| | ) | Judge, presiding. |

---

PRESIDING JUSTICE BOIE delivered the judgment of the court, with opinion.
Justices Cates and Vaughan concurred in the judgment and opinion.

**OPINION**

¶ 1    The respondent, Johnathan T., a minor, was found guilty of 10 counts of aggravated criminal sexual assault and sentenced to the Department of Juvenile Justice. He appeals the adjudication of delinquency and argues that the circuit court erred in failing to conduct an inquiry into his *pro se* claim of ineffective assistance of counsel as required by *People v. Krankel*, 102 Ill. 2d 181 (1984). He also argues that the State's evidence was insufficient to prove him guilty of one of the counts of aggravated criminal sexual assault and that the circuit court failed to follow statutory requirements in committing him to the Department of Juvenile Justice. For the following reasons, we affirm.

1

¶ 2                                    I. BACKGROUND

¶ 3      On April 19, 2018, the State filed a petition for the adjudication of wardship of Johnathan

T. alleging that he committed 10 acts of aggravated criminal sexual assault against B.A.B., a minor

who was seven years old at the time of the incidents, in violation of section 11-1.30(b)(i) of the

Criminal Code of 2012 (720 ILCS 5/11-1.30(b)(i) (West 2018)). The alleged acts occurred

between August 1, 2017, and January 18, 2018, when Johnathan T. was 15 and 16 years old.

Counts I through VII alleged that Johnathan T. committed acts of sexual penetration with B.A.B.

by placing his penis in contact with B.A.B.'s anus. Counts VIII through X alleged that Johnathan

T. committed acts of sexual penetration by placing his penis in contact with B.A.B.'s vagina.

¶ 4      On November 15, 2019, the parties appeared in court for an adjudication hearing on the

State's petition. The evidence presented at the adjudicatory hearing established that from August

2017 until January 18, 2018, Johnathan T.'s mother, Christi, babysat B.A.B. after school when

B.A.B. was in the first grade. Johnathan T. was also present at Christi's house after school at times

when B.A.B. was present along with other children that Christi babysat. On Friday, January 19,

2018, B.A.B. told her father that Johnathan T. had been touching her while she was being babysat

at Christi's house. B.A.B. told her father that Johnathan T. would take her into his room and touch

her private area. B.A.B.'s father called the police, who began investigating the allegations.

¶ 5      A forensic interviewer, Dawn Wright, interviewed B.A.B. at a child advocacy center on

January 24, 2018. The circuit court admitted a video recording of the forensic interview as

substantive evidence.[1] During the forensic interview, B.A.B. told Wright that Johnathan T. had

touched her "pee pee." B.A.B. explained to Wright that Johnathan T. laid her face down on the

floor, unbuttoned his pants, and took his privates and touched her privates. B.A.B. also told Wright

_____

        [1]See 725 ILCS 5/115-10 (West 2018).

that Johnathan T. took his "weenie" and touched her "pee pee" with their pants down. B.A.B. stated that Johnathan T. would put his "weenie" inside her "pee pee" and described occasions when Johnathan T. laid her down and put his "weenie" in her butt. She specifically stated that Johnathan T. put his "weenie" in her butt seven or eight times and that he put his "weenie" in her "pee pee" two or three times. B.A.B. also told Wright that Johnathan T. had touched her breasts with his hands underneath her clothes. B.A.B. told Wright that when Johnathan T. put his "weenie" in her butt it hurt, and when Johnathan T. he put his "weenie" in her "pee pee," it hurt at first but that she got used to it.

¶ 6    A child abuse pediatrician, Dr. Kathy Swafford, conducted a medical abuse examination of B.A.B. in February 2018. Prior to the physical examination, Dr. Swafford learned that the incidents, as reported by B.A.B., involved Johnathan T. lying on top of B.A.B. and putting his "weenie *** in her butt and then in her private area." According to Dr. Swafford, when she asked B.A.B. about the incidents, B.A.B. did not report any bleeding but stated that the incidents were painful.

¶ 7    At the adjudicatory hearing, Dr. Swafford opined that B.A.B. had a normal physical exam and had negative screening for sexually transmitted diseases or urinary tract infection. Dr. Swafford explained to the circuit court that although there were no physical findings indicative of sexual abuse, when the physical examination is conducted two weeks or more after the abuse, any physical findings typically would have healed. Dr. Swafford also explained that in 94% to 98% of cases involving sexual abuse of children there is no specific residual physical finding.

¶ 8    A police investigator interviewed Johnathan T. with the permission of Johnathan T.'s parents. At the adjudicatory hearing, the investigator told the circuit court that during the interview Johnathan T. denied doing anything sexual in nature toward B.A.B. Instead, Johnathan T. told the

3

investigator that he was never alone with B.A.B. and never touched B.A.B. inappropriately but admitted to wrestling with her and holding her arms down. In addition, the investigator told the circuit court that Johnathan T.'s parents reported to him that they never witnessed anything inappropriate between Johnathan T. and B.A.B. and that B.A.B. had a history of lying.

¶ 9    The investigator also interviewed B.A.B.'s grandmother. According to the grandmother, B.A.B. told the grandmother that Johnathan T. had touched her inappropriately. The grandmother told the investigator that B.A.B. demonstrated some "humping motions" and stated that Johnathan T. had touched her with his penis "in the front and the back."

¶ 10    B.A.B. testified at the adjudication hearing via closed circuit television and told the circuit court about the incidents. At the time of her testimony, B.A.B. was nine years old and was in the third grade. B.A.B. testified that Johnathan T. was at Christi's house when she was dropped off there after school when she was in the first grade beginning in August 2017. B.A.B. testified that, while being babysat, Johnathan T. pulled her pants down and kissed her and touched her private area with his privates. She testified that Johnathan T. touched her with his privates "usually around the back area and stuff." She testified that Johnathan T. also touched her privates with his privates and that it usually happened just about every time she was at Christi's house. B.A.B. testified that initially she did not know that anything was wrong with what Johnathan T. was doing but later she realized that "something wasn't right."

¶ 11    Johnathan T. testified at the adjudicatory hearing that he was never alone with B.A.B. and that he never engaged in any inappropriate sexual behavior with her. He denied pulling his pants down in front of B.A.B. and denied touching her. Johnathan T.'s mother, Christi, also testified that Johnathan T. was never alone with B.A.B. However, Christi agreed that Johnathan T. could have been at the neighbor's house with B.A.B. and would have been out of her sight.

4

¶ 12    The circuit court took the matter under advisement and, on December 4, 2019, entered an order finding Johnathan T. guilty on all counts beyond a reasonable doubt. The circuit court found B.A.B. to be credible and noted that her testimony was "spectacular in certain details."

¶ 13    After the circuit court found Johnathan T. guilty of the 10 counts of aggravated criminal sexual assault, the circuit court directed the probation department to prepare a social investigation report and ordered Johnathan T. to undergo a sex offender evaluation prior to the dispositional hearing. During the sex offender evaluation, the evaluator asked Johnathan T., "What kind of job is your lawyer doing?" Johnathan T. replied, "We don't talk. I'm never prepared for the stand. He does not answer calls." A report of the sex offender evaluation, which included Johnathan T.'s answer to the social worker's question about the defense attorney, and the social investigation report prepared by the probation department were filed with the circuit court prior to the dispositional hearing and were reviewed by the circuit court before the dispositional hearing. The probation officer that prepared the social investigation report reported that he asked Johnathan T. if he would like to make a written statement, and Johnathan T. declined to do so.

¶ 14    On August 5, 2020, the circuit court conducted the dispositional hearing and heard testimony from Johnathan T.'s parents in which they requested that the circuit court give Johnathan T. probation. The circuit court also considered arguments from the attorneys concerning the appropriate sentence. At the conclusion of the hearing, the circuit court found that it was in the best interest of Johnathan T. and the public that Johnathan T. be made a ward of the court. The circuit court further found that probation would depreciate the seriousness of the offenses and would not serve the best interest of Johnathan T. and the public. The circuit court stated, "Specifically finding that [Johnathan T.'s] parents are unable to protect, train or discipline the

5

minor, no other placement under section 5-740 would serve the best interest of the minor and the public." The circuit court further stated,

"Based upon the social investigation report and the sex offender report, I think the Department of Juvenile Justice is the least restrictive alternative based on the evidence, and his secure confinement is necessary based upon services in the Department of Juvenile Justice which will meet his individualized needs, his criminal background, physical, mental, emotional help, where reasonable efforts have been made to prevent, to eliminate, the need for removal from the home is in his best interest."

Therefore, the circuit court sentenced Johnathan T. to the Department of Juvenile Justice for an intermediate period not to exceed his twenty-first birthday.

¶ 15    Neither Johnathan T. nor his parents voiced any statements about Johnathan T.'s attorney at any time prior to, during, or after the dispositional hearing, and the circuit court did not ask Johnathan T. or his attorney any questions about Johnathan T.'s statements about the attorney made to the social worker as reflected in the sex offender evaluation report. Johnathan T. now appeals the adjudication of delinquency and his sentence.

¶ 16                                   II. ANALYSIS

¶ 17    On appeal, Johnathan T. first argues that his statements about his attorney during the postadjudication sex offender evaluation constituted a *pro se* claim of ineffective assistance of counsel. Johnathan T. concludes, therefore, that the circuit court erred in failing to conduct a *Krankel* inquiry.

¶ 18    In *Krankel*, 102 Ill. 2d 181, our supreme court established a common law procedure that circuit courts must follow when a defendant makes a *pro se*, posttrial claim of ineffective assistance of counsel. This common law procedure is sometimes referred to as a preliminary

6

*Krankel* inquiry, *Krankel* procedure, or *Krankel* hearing. See *People v. Jolly*, 2014 IL 117142, ¶ 28 ("preliminary *Krankel* inquiry"); *People v. Jackson*, 2020 IL 124112, ¶¶ 95-97 ("*Krankel* procedure"); and *People v. Schnoor*, 2019 IL App (4th) 170571, ¶ 34 ("*Krankel* hearing").

¶ 19 Under the *Krankel* procedure, when a criminal defendant raises a *pro se* claim of ineffective assistance of counsel after a trial, "the trial court must conduct an inquiry into the factual basis of the defendant's claim to determine whether new counsel should be appointed to assist the defendant." *People v. Bell*, 2018 IL App (4th) 151016, ¶ 35. If the initial inquiry reveals that trial counsel may have neglected the defendant's case, the circuit court should appoint new counsel and set the matter for a hearing. *People v. Moore*, 207 Ill. 2d 68, 78 (2003). However, if after the initial inquiry the court determines that the defendant's claim lacks merit or pertains only to matters of trial strategy, then no further action by the circuit court is required. *Id.*

¶ 20 The *Krankel* procedure is a common law procedure established by our supreme court in order "to promote consideration of *pro se* ineffective assistance claims in the trial court and to limit issues on appeal." *People v. Patrick*, 2011 IL 111666, ¶ 41. The procedure also encourages the circuit court to exercise its fact-finding abilities and "create the necessary record for any claims raised on appeal." *Jolly*, 2014 IL 117142, ¶ 38. When a defendant triggers the *Krankel* procedure by making a *pro se* claim of ineffective assistance of counsel, and the circuit court fails to conduct the initial *Krankel* inquiry, the appropriate remedy on appeal is a remand to the circuit court for the *Krankel* procedure to take place. *People v. Ayres*, 2017 IL 120071, ¶¶ 24-26. The appellate court reviews the issue of whether a circuit court should have conducted a *Krankel* inquiry under the *de novo* standard of review. *People v. Taylor*, 237 Ill. 2d 68, 75 (2010).

¶ 21       A. Application of the *Krankel* Procedure in Juvenile Delinquency Proceedings

¶ 22    In the present case, in addressing Johnathan T.'s *Krankel* argument, the first issue we must consider is whether the supreme court's *Krankel* procedure applies to delinquency proceedings. Although the State has not challenged the application of the *Krankel* procedure in juvenile delinquency proceedings, we must answer this threshold question before analyzing whether the *Krankel* procedure was triggered in this case.

¶ 23    *Krankel* involved a *pro se* claim of ineffective assistance of counsel in a criminal proceeding. *Krankel*, 102 Ill. 2d at 187. The present case is a juvenile delinquency proceeding, not a criminal proceeding, and the supreme court has not yet spoken on whether the *Krankel* procedure is applicable to juvenile delinquency proceedings. Juvenile delinquency proceedings are civil in nature, to correct and rehabilitate, not punish. *In re R.G.*, 283 Ill. App. 3d 183, 186 (1996). Nonetheless, in *In re T.R.*, 2019 IL App (4th) 190051, ¶ 29, the court held that *Krankel* applied to juvenile delinquency proceedings. In its reasoning, the *T.R.* court observed that the purpose of *Krankel* applies equally to juvenile delinquency cases and that juveniles who have been adjudicated delinquent have a very limited opportunity to raise ineffective assistance of counsel claims. *Id.* ¶ 28.

¶ 24    We agree with the *T.R.* court's analysis. Although juvenile delinquency proceedings are civil in nature (*In re Jonathon C.B.*, 2011 IL 107750, ¶ 96), minors in delinquency proceedings have a constitutional right to effective assistance of counsel (*People v. Austin M.*, 2012 IL 111194, ¶ 74). "[W]ith the exception of the right to a jury trial, the fourteenth amendment to the United States Constitution extends to delinquent minors all of the basic rights enjoyed by criminal defendants." *Austin M.*, 2012 IL 111194, ¶ 76. Accordingly, we find no basis to exclude the supreme court's common law *Krankel* procedure from being applied in delinquency proceedings.

8

¶ 25   B. Whether Johnathan T. Made *Pro Se* Statements That Triggered the *Krankel* Procedure

¶ 26   Next, the parties' respective arguments on appeal focus on the method in which Johnathan T. complained about his counsel's performance and the manner in which the circuit court became aware of Johnathan T.'s statements about his attorney. Johnathan T. never made any *pro se* statements about his attorney directly to the circuit court by way of a written motion, note, letter, or oral statements to the judge in open court. Instead, following the finding of guilt at the adjudicatory hearing, when Johnathan T. submitted to the sex offender evaluation, the evaluator asked Johnathan T., "What kind of job is your lawyer doing?" Johnathan T. answered, "We don't talk. I'm never prepared for the stand. He does not answer calls." Although Johnathan T. never made these or similar statements directly to the circuit court, the circuit court should have become aware of these statements when it reviewed the sex offender evaluation report prior to the dispositional hearing.

¶ 27   On appeal, Johnathan T. argues that even though he never complained directly to the circuit court, his statements to the social worker as reflected in the sex offender evaluation report were sufficient to trigger the *Krankel* procedure. The State, however, argues that the statements made to the social worker outside of court were insufficient to trigger the *Krankel* procedure. We agree with the State, although for reasons different than argued in its brief.

¶ 28   The State relies on two cases, *People v. Reed*, 197 Ill. App. 3d 610, 612 (1990), and *People v. Harris*, 352 Ill. App. 3d 63, 64-65 (2004), where the reviewing courts held that *pro se* statements that the defendants made to social workers, during presentencing investigations, regarding their counsels' performances, were not sufficient to trigger *Krankel* inquiries. In *Reed*, prior to sentencing, the circuit court reviewed a defendant's presentence investigation (PSI) report in which it was noted that the defendant had " 'expressed his opinion that he was poorly represented at his

9

trial and said he plans to file an Appeal.' " *Reed*, 197 Ill. App. 3d at 612. The defendant, however, made no express written or oral motion to the circuit court raising a claim of ineffective assistance of counsel or requesting substitute counsel. *Id.* Our colleagues in the Second District in *Reed*, therefore, held that the defendant's statement in the PSI report was insufficient to trigger a *Krankel* inquiry. *Id.* The *Reed* court noted that the defendant did not, in any manner, request counsel to assist him with a claim of ineffective counsel. *Id.* The *Reed* court also stated, "While we do not suggest that a *pro se* claim of ineffective trial counsel need take a specific form, we cannot expect the trial court to divine such a claim where it is not even arguably raised." *Id.*

¶ 29    Likewise, in *Harris*, the First District adopted and applied the *Reed* court's analysis. In that case, the defendant's PSI report included the defendant's statement that his attorney did not prepare him for trial and that he did not get to call any of his witnesses. *Harris*, 352 Ill. App. 3d at 71. The *Harris* court cited *Reed* and held that the defendant's statement contained in the PSI report, without more, was insufficient to raise a claim of ineffective assistance to the circuit court and did not warrant a *Krankel*-type inquiry. *Id.* at 72. The *Harris* court noted that the defendant never raised the issue to the court by way of written motion and did not even repeat the allegation or request new counsel when he was given the opportunity to orally address the court at his sentencing hearing. *Id.*

¶ 30    We decline to follow the reasoning of *Harris* and *Reed*. Since *Harris* and *Reed*, the First and Second Districts have reversed their stances on this issue. In *People v. Downing*, 2019 IL App (1st) 170329, ¶ 35, the First District expressly rejected the reasoning set out in *Reed* and *Harris* and, instead, held that "the better rule is to require a preliminary *Krankel* inquiry in this context— that is, when the trial court is made aware in open court that a defendant has made complaints about his trial representation."

10

¶ 31 In *Downing*, the PSI report stated that the defendant complained that his lawyer failed to call three witnesses, that the defendant wanted to replace his lawyer, and that the defendant's attorney did not let the defendant testify in his own defense. *Id.* ¶ 17. The court held that the "content" of the defendant's complaints clearly raised a *pro se* complaint of ineffective assistance of counsel sufficient to trigger *Krankel*. *Id.* However, the defendant "filed nothing with the court regarding ineffective assistance, nor did he utter any such words in open court." *Id.* ¶ 18. The *Downing* court, therefore, focused on the "the manner in which [the defendant's complaints] were received by the trial court." *Id.* The defendant's complaints about his attorney first appeared in the PSI and were later communicated in open court by the State in aggravation at the sentencing hearing. *Id.*

¶ 32 In holding that the statements made in the PSI report triggered a *Krankel* inquiry, the *Downing* court noted that, although the presentence investigation process takes place entirely outside of the courtroom, the trial court is, nonetheless, required to consider it and presumed to have read it. *Id.* ¶ 29. The *Downing* court noted that the *Krankel* procedure furthered the judiciary's goal of accurate and efficient decision-making and that these goals are best served if trial judges are required to conduct preliminary inquiries whenever a defendant's posttrial allegations of attorney incompetence have been brought to the circuit court's attention. The court, therefore, concluded, "[B]ecause the point of *Krankel* is as much about ensuring accurate and efficient decision-making as it is protecting a defendant's rights, the defendant's manifested intent to raise the issue to the trial court should not be the *only* way that *Krankel* is triggered." (Emphasis in original.) *Id.* ¶ 42.

¶ 33 Likewise, in *People v. Craig*, 2020 IL App (2d) 170679, ¶ 18, the Second District held that a defendant's statement made during a presentence investigation and set out in the PSI report

11

sufficiently triggered a *Krankel* inquiry. The defendant in *Craig* was convicted of multiple counts of predatory criminal sexual assault of a child and aggravated criminal sexual abuse. *Id.* ¶ 1. The victims were the defendant's nieces and nephew. *Id.* ¶ 4. The PSI report included information concerning complaints the defendant made about his attorney as follows:

" '[Defendant] stated that his lawyer did not have his niece or his mother come to court to testify on his behalf. He stated that his niece was taking care of these kids (his brother's children) and he was never at his niece's house and the kids told the niece that [defendant] never did anything.' " (Emphasis omitted.) *Id.* ¶ 8.

¶ 34     In ruling that the statements in the PSI report triggered the *Krankel* process, the *Craig* court first addressed the substance of the defendant's statements. The court held that, in substance, the complaints were sufficient to trigger *Krankel* because "the statements in the PSI attributed to defendant specifically refer to counsel's failure to do something." *Id.* ¶ 17. The defendant's statements implied "that counsel was ineffective for failing to call his niece, who would have testified that the victims reported to her that defendant did not commit the offense." *Id.*

¶ 35     Turning to the issue of whether the defendant's complaints were properly presented to the circuit court, the *Craig* court held that the defendant's complaints triggered *Krankel* even though it was " 'buried in the text of a PSI report.' " *Id.* ¶ 18. In its reasoning, the *Craig* court emphasized that the defendant's statements within the PSI report were "unquestionably those of the defendant" and that the report was "prepared *for the court*, and the court is required to consider it." (Emphasis in original.) *Id.* The *Craig* court concluded, "Given that the court read the allegations of ineffectiveness, which were made by defendant to a court employee for inclusion in a report prepared specifically for the court, an inquiry under *Krankel* was warranted." *Id.*

12

¶ 36    Finally, in *People v. Sherman*, 2020 IL App (1st) 172162, ¶¶ 43-46, another panel in the First District specifically rejected *Harris*, adopted the reasoning in *Downing*, and held that statements by the defendant that were reported in a PSI report were sufficient to trigger a *Krankel* inquiry. In *Sherman*, the defendant was convicted of being an armed habitual criminal. *Id.* ¶ 1. The PSI report included the defendant's complaints about his attorney as follows:

> " '[N]o lawyer came to talk to me before the trial. I wanted to testify to tell them what happened and explain how I did not see the gun on his person. I seen the gun after he pulled it out, not when he got in the car. I just want to show how he concealed the gun. I would like to ask the judge to let me demonstrate how the weapon was concealed.' " *Id.* ¶ 44.

¶ 37    In addressing the substance of the defendant's complaints, the *Sherman* court noted that while the defendant did not expressly accuse his attorney of ineffective assistance, he "clearly alleged that (1) counsel did not consult with him before trial and (2) he wanted to testify and give his account of events to the court." *Id.* The court concluded that "[t]hese allegations are reasonably read as a claim that counsel deprived him of his right to testify by not properly consulting with him." *Id.*

¶ 38    Although the defendant did not raise his complaints in open court, the *Sherman* court noted that "our supreme court has emphasized *** both that a *pro se* ineffectiveness claim need not be specific and need not be raised formally so long as it is brought to the trial court's attention." *Id.* ¶ 43. In holding that the PSI report triggered *Krankel*, the *Sherman* court stated, "While defendant did not raise these allegations in open court, he raised them in the PSI, which as we stated above a trial court is expected to consider and which the trial court here acknowledged reading." *Id.* ¶ 45. The *Sherman* court, therefore, held that a defendant's ineffectiveness claim in a PSI report, intended to be read by the trial court, triggered a *Krankel* inquiry. *Id.*

13

¶ 39 The defendant asks us to apply the reasoning of *Downing*, *Craig*, and *Sherman* to the facts of this case. Although we decline the State's request that we apply *Reed* and *Harris* in this case, we also decline the defendant's request that we apply the reasoning of *Downing*, *Craig*, and *Sherman*. We believe *Downing*, *Craig*, and *Sherman* are distinguishable.

¶ 40 The present case is a juvenile delinquency proceeding. In juvenile delinquency proceedings, instead of a PSI report, the probation department prepares a "social investigation report." 705 ILCS 405/5-701 (West 2018). As more fully described herein, we find that the social investigation report, with its inclusion of the sex offender evaluation, is distinguishable from a presentence investigation such that we cannot simply apply the *Downing*, *Craig*, and *Sherman* courts' analysis of *Krankel*. Johnathan T.'s purported triggering statements in the present case are contained in the sex offender evaluation report. Therefore, we must consider the nature and purpose of the sex offender evaluation process as a part of the social investigation.

¶ 41 In a juvenile delinquency proceeding, after finding a juvenile guilty at the dispositional hearing stage, at sentencing, the circuit court must determine whether it is in the best interests of the minor and the public that he or she be made a ward of the court. Section 5-620 of the Juvenile Court Act of 1987 (Juvenile Court Act) states that "[t]o assist the court in making this and other determinations at the sentencing hearing, the court may order that an investigation be conducted and a social investigation report be prepared." *Id.* § 5-620. The social investigation report is similar to a PSI report for an adult defendant but with a special emphasis on resources for the minor's rehabilitation. *Id.* Section 5-701 of the Juvenile Court Act, in turn, sets out the requirements for the social investigation report as follows:

"Upon the order of the court, a social investigation report shall be prepared and delivered to the parties at least 3 days prior to the sentencing hearing. The written report of social

14

investigation shall include an investigation and report of the minor's physical and mental history and condition, family situation and background, economic status, education, occupation, personal habits, minor's history of delinquency or criminality or other matters which have been brought to the attention of the juvenile court, information about special resources known to the person preparing the report which might be available to assist in the minor's rehabilitation, and any other matters which may be helpful to the court or which the court directs to be included." *Id.* § 5-701.

¶ 42 Nothing in section 5-701 suggests that potential claims of ineffective assistance of counsel is a topic to be included in the social investigation report. Indeed, the matters required to be included are designated to provide the court with sufficient information to determine what resources might be available to rehabilitate the minor.

¶ 43 Section 5-701 further provides that, in sex offense cases, the social investigation must include a sex offender evaluation as part of the social investigation. Specifically, section 5-701 states:

"Any minor found to be guilty of a sex offense as defined by the Sex Offender Management Board Act [(20 ILCS 4026/1 *et seq.* (West 2018))] shall be required as part of the social investigation to submit to a sex offender evaluation. The evaluation shall be performed in conformance with the standards developed under the Sex Offender Management Board Act and by an evaluator approved by the Board." *Id.*

¶ 44 The purposes of the sex offender evaluation are defined as follows: (1) to assess overall risk to the community; (2) to provide protection for victims and potential victims; (3) to provide a written clinical summary of the juvenile's strengths, risks, deficits, including any and all comorbid conditions or developmental disorders; (4) to identify and document treatment and developmental

15

needs; (5) to determine amenability for treatment; (6) to identify individual differences, potential barriers to treatment, and static and dynamic risk factors; (7) to make recommendations for the management and supervision of the juvenile; and (8) to provide information that can help identify the type and intensity of community based treatment, or the need for a more restrictive setting. 20 Ill. Adm. Code 1910.130(b) (2009). These defined purposes of the sex offender evaluation do not include vetting for possible claims of ineffective assistance of counsel. Again, the inquiry is designed to address the needs of the juvenile for rehabilitation and treatment.

¶ 45    The regulatory scheme for sex offender evaluations of juveniles also includes defined requirements that the evaluator must accomplish while conducting the evaluation. Those requirements include describing to the juvenile and the parents or guardians evaluation methods, how the information will be used, with whom it will be shared, and the nature of the evaluator's relationship with the juvenile and with the court; respecting the juvenile's right to be fully informed about the evaluation procedures; reviewing the results of the evaluation with the juvenile and the parent or guardian; and selecting evaluation procedures relevant to the individual circumstances of the case and commensurate with their level of training and expertise. 20 Ill. Adm. Code 1910.130 (2009). Again, none of these requirements touch upon the effectiveness of the juvenile's attorney.

¶ 46    The evaluation of a juvenile sex offender occurs in five phases. *Id.* § 1910.140. The present case concerns the second phase: "Presentence and post-adjudication evaluation." *Id.* § 1910.140(b). At this phase, the evaluation "focuses on dangerousness, risk, placement and amenability to treatment and must be completed prior to sentencing to identify the juvenile's level of dangerousness and risk, residential needs, level of care, and treatment referrals." *Id.* Again, this focus does not include screening for ineffectiveness of counsel claims.

16

¶ 47    The regulations require that the comprehensive sex offender evaluation shall assess the juvenile in the following areas: (1) cognitive functioning, including educational history; (2) personality, mental health, and mental disorders; (3) social/developmental history; (4) current individual functioning; (5) current family functioning; (6) sexual background and history, to include function and dysfunction; (7) delinquency and conduct/behavioral issues, including substance or alcohol abuse; (8) assessment of risk to reoffend; (9) community risks and protective factors; (10) victim impact; (11) external relapse prevention strategies, including informed supervision; and (12) amenability to treatment. *Id.* § 1910.150. None of these areas encompass potential claims of ineffective assistance of counsel.

¶ 48    As to the content of the sex evaluation report, the regulations state that the evaluation report must (1) describe the juvenile's strengths, deficits, risks for reoffense and all comorbid conditions and/or developmental disorders; (2) recommend the management and supervision strategies for the juvenile; (3) recommend the type and intensity of treatment; and (4) recommend placement options that protect victims and potential victims ranging from placement in a family home through secure care in a locked facility. *Id.* § 1910.160(c). Again, none of the mandated regulatory content includes anything that would pertain to potential claims of ineffective assistance of counsel.

¶ 49    When we consider the statutory and regulatory scheme for establishing the requirements for a sex offender evaluation, we conclude that a sex offender evaluation report is not a document whose content would be expected to trigger a *Krankel* inquiry, and the circuit court would not be expected, during its reading of the report, to be looking for claims of ineffective assistance of counsel. Nothing within the statutes and regulations establishing the process and procedures for sex offender evaluations contemplates the evaluator questioning the juvenile about potential claims of ineffectiveness of the juvenile's counsel.

17

¶ 50    Our supreme court has provided numerous ways to raise a *pro se* claim of ineffective assistance of counsel sufficient to trigger the *Krankel* procedure. The defendant may do so by way of a written *pro se* posttrial motion or an informal written motion, or he or she may also address the judge orally in open court or give the circuit court a letter or a note. A defendant can also ask his or her attorney to raise the issue on his or her behalf. *People v. Bates*, 2019 IL 124143, ¶ 15; *Downing*, 2019 IL App (1st) 170329, ¶ 26. The supreme court has not authorized questioning by a sex offender evaluator as a method for triggering the *Krankel* inquiry, and we decline to apply *Krankel* to the statements made by Johnathan T. in the sex offender evaluation report under the facts of this case.

¶ 51    We understand that the threshold requirement to trigger a *Krankel* inquiry is low. We also understand that a defendant need not formally make his or her ineffectiveness claim by following strict court procedures, nor must he or she support it with specific facts or examples. See *Ayres*, 2017 IL 120071, ¶¶ 11, 18-19. However, in the present case, Johnathan T.'s only statements regarding his counsel's performance were contained in the sex offender evaluation report and were made in response to a single question asked by the social worker. Neither Johnathan T. nor his parents raised any issue in open court with respect to the attorney's performance or otherwise directed any statements or complaints to the circuit court by way of a letter or an oral or written motion or statement.

¶ 52    The supreme court has plainly stated that to trigger the *Krankel* procedure, a defendant must "*bring his or her claim to the trial court's attention*." (Emphasis added.) *Moore*, 207 Ill. 2d at 79. Johnathan T. answering a single question during the sex offender evaluation with vague statements about his attorney does not constitute bringing a claim to the circuit court's attention. The regulations required that the evaluator's report focus "on dangerousness, risk, placement and

18

amenability to treatment and must be completed prior to sentencing to identify the juvenile's level of dangerousness and risk, residential needs, level of care, and treatment referrals." 20 Ill. Adm. Code 1910.140(b) (2009). Therefore, we decline to expand the *Krankel* process to include the sex offender evaluation in this case.

¶ 53    Our holding in this case is not that statements in a sex offender evaluation report can never trigger *Krankel*. There may be circumstances in which a juvenile's statement contained in such a report would trigger a *Krankel* inquiry. However, in the present case, when we consider the vagueness of Johnathan T.'s statements (*i.e.*, "We don't talk. I'm never prepared for the stand. He does not answer calls.") together with the context in which Johnathan T. made the statements (not directly to the circuit court or in open court but to a social worker outside of court and in response to a question), we cannot fault the circuit court for failing to conduct a *Krankel* inquiry. Nothing in the record suggests that by answering the social worker's question Johnathan T. was attempting to bring complaints about his attorney specifically to the circuit court's attention, and the circuit court would not have been expected to discern a *Krankel* complaint, as the report was not designed to elicit such information. In fact, when given the opportunity to make a statement to be included in the social investigation report, Johnathan T. declined to do so. Had Johnathan T. intended to raise an ineffectiveness claim, we believe he would have done so during the social investigation when given the opportunity. Therefore, under the facts of this case, Johnathan T.'s vague statements made during the sex offender evaluation, without more, were insufficient to trigger a *Krankel* inquiry.

¶ 54                    C. Sufficiency of the State's Evidence of Guilt

¶ 55    Johnathan T. next argues that the State failed to prove beyond a reasonable doubt that he was guilty of aggravated criminal sexual assault as alleged in count I of the petition for adjudication of wardship. We disagree.

¶ 56    Like criminal proceedings, in juvenile delinquency proceedings the State has the burden of proving the elements of the offenses charged with proof beyond a reasonable doubt. *In re Christian W.*, 2017 IL App (1st) 162897, ¶ 24. "Reasonable doubt exists as a matter of law when the State fails to prove an essential element of the offense." *People v. Johnson*, 2014 IL App (1st) 122459-B, ¶ 130. On appeal, we will not overturn a circuit court's delinquency finding unless, after viewing the evidence in the light most favorable to the State, no rational finder of fact could have found that the State proved the offenses beyond a reasonable doubt. *In re Gino W.*, 354 Ill. App. 3d 775, 777 (2005). Our task is to evaluate whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Maggette*, 195 Ill. 2d 339, 353 (2001). "Under this standard, a reviewing court must allow all reasonable inferences from the record in favor of the prosecution." *People v. Givens*, 237 Ill. 2d 311, 334 (2010).

¶ 57    When a circuit court receives conflicting versions of the events from witnesses, such as the evidence in the present case, the credibility of witnesses, the weight to be given to their testimony, and the reasonable inferences to be drawn from the evidence are matters within the province of the trier of fact. *People v. Ross*, 229 Ill. 2d 255, 272 (2008). The testimony of a single witness is sufficient to convict, even when contradicted by the defendant, if the testimony is positive and the witness credible. *People v. Anderson*, 325 Ill. App. 3d 624, 634 (2001). The State does not have to corroborate a victim's testimony with physical or scientific evidence in order to convict a defendant. *People v. Willer*, 281 Ill. App. 3d 939, 948-49 (1996). A conviction will be reversed

only where the evidence is so unreasonable, improbable, or unsatisfactory that a reasonable doubt of the defendant's guilt remains. *People v. Beauchamp*, 241 Ill. 2d 1, 8 (2011).

¶ 58 In the present case, in count I of the petition for the adjudication of wardship, the State alleged an incident of aggravated criminal sexual assault that occurred on or about January 18, 2018. Specifically, count I alleged that Johnathan T. "placed his penis in contact with the anus of B.A.B." on or about January 18, 2018. In the remaining counts, counts II through X, the State alleged incidents of aggravated criminal sexual assault that occurred over a period of time, August 1, 2017, through January 18, 2018, rather than a specific date. Johnathan T. argues that the State did not present sufficient evidence to prove that the incident alleged in count I occurred. Johnathan T. is incorrect. The evidence presented at the adjudicatory hearing was sufficient to prove him guilty of aggravated criminal sexual assault as alleged in all 10 counts, including count I, beyond a reasonable doubt.

¶ 59 B.A.B. testified that Johnathan T. touched her "private part" with his "privates," usually around the "back area and stuff." She testified that the last assault involved Johnathan T. touching her with his privates "most[ly]" in her "back" while she faced the ground. In considering B.A.B.'s testimony, we note that "sexual penetration" is statutorily defined as

"any contact, however slight, between the sex organ or anus of one person and an object or the sex organ, mouth, or anus of another person, or any intrusion, however slight, of any part of the body of one person or of any animal or object into the sex organ or anus of another person, including, but not limited to, cunnilingus, fellatio, or anal penetration." 720 ILCS 5/11-0.1 (West 2018).

During her forensic interview, B.A.B. stated that Johnathan T. committed acts of anal sexual penetration about seven or eight times and vaginal sexual penetration about two to three times.

21

¶ 60    On appeal, Johnathan T. emphasizes that the State distinguished between count I and the remaining counts by alleging a specific date in count I but alleging a date range in the remaining counts. Johnathan T. argues, therefore, that the State was obligated to prove that he placed his penis in contact with B.A.B.'s anus "on or about January 18, 2018." He maintains that neither B.A.B.'s statements during the videotaped forensic interview nor her testimony at the hearing established that this specific act occurred on or about January 18, 2018. Johnathan T. notes that during the videotaped forensic interview, B.A.B. stated that the last incident occurred January 17 or 18 and involved Johnathan T. placing his penis in B.A.B.'s vagina, not her anus as alleged in the State's petition.

¶ 61    As the State correctly notes in its brief, however, the date of the offense is not an essential element in child sex offenses. *People v. Barlow*, 188 Ill. App. 3d 393, 402 (1989). "The date alleged in the charging instrument ordinarily need not be proved precisely and any irregularity between the [charging instrument] and proof establishing the offense was committed on a date other than that precisely alleged is not a fatal variance." *People v. Smith*, 337 Ill. App. 3d 819, 824 (2003). In fact, our supreme court has recognized "that it is often difficult in the prosecution of child sexual abuse cases to pin down the times, dates, and places of sexual assaults, particularly when the defendant has engaged in a number of acts over a prolonged period of time." *People v. Bishop*, 218 Ill. 2d 232, 247 (2006). The State need only establish that the offense charged was committed within the statute of limitations period and prior to the return of the indictment. *Barlow*, 188 Ill. App. 3d at 402.

¶ 62    Proof of the exact date on which the offense occurred becomes significant where inconsistencies between the date charged and the evidence presented at the trial are so great that a defendant is misled in presenting his defense or when he presents an alibi for the time alleged in

22

the indictment and is thereby prejudiced because he had not prepared evidence for the time proven at the trial. *People v. Stevens*, 2018 IL App (4th) 160138, ¶ 30. In situations such as the present case, where Johnathan T. has denied committing the crime on any date, he is not prejudiced by any discrepancy in the date of the offense. *People v. Sims*, 2019 IL App (3d) 170417, ¶ 40; see also Illinois Pattern Jury Instructions, Criminal, No. 3.01 (approved Oct. 17, 2014) (instructing the jury that if the defendant committed the offense charged, the State was not required to prove that it was committed on the particular date).

¶ 63    In *People v. Escobedo*, 151 Ill. App. 3d 69 (1986), the defendant was charged with two counts of indecent liberties with a child. A bill of particulars identified two specific dates and stated that the first incident involved " 'oral copulation' " while the second was an act of " 'lewd fondling.' " *Id.* at 74. At trial, the child victim was unable to state the exact dates of the incidents, but she had previously reported that there were four to seven incidents. The child victim also placed the incidents in the month alleged in a bill of particulars and gave a detailed account of the events. *Id.* at 75-76.

¶ 64    The *Escobedo* court applied the more stringent and no longer applicable standard of review (requiring substantially corroborated clear and convincing evidence). *Id.* at 81. Nonetheless, the court concluded that the State presented sufficient evidence to convict. Although the child victim could not specify with certainty the dates, or days of the week, of the offenses, the court did not "attach particular significance to her inability to do so." *Id.* at 82. The court noted that the child victim had testified to being molested by the defendant on four to seven occasions, including the two incidents with which the defendant was charged. Because of the ongoing nature of the offenses, the *Escobedo* court believed "that it is not unreasonable that the minor complainant would not be able to pinpoint the exact dates of the two incidents forming the basis of defendant's

23

prosecution." *Id.* The child victim's inability to do so was a matter for the trier of fact to weigh and consider. *Id.* Therefore, the court held that the State proved the defendant guilty beyond a reasonable doubt despite the child victim being unable to state the exact dates of the incidents. See also *People v. Foley*, 206 Ill. App. 3d 709, 715 (1990) ("The inability to remember exact dates and times merely affects the weight to be given the testimony and, taken alone, does not create reasonable doubt."); see also *People v. Letcher*, 386 Ill. App. 3d 327, 332-36 (2008).

¶ 65    Other jurisdictions similarly have held that a child victim need not specify the exact number of times that the incidents occurred so long as there were some reliable indicia that the number of charged acts actually occurred. *Rose v. State*, 163 P.3d 408, 414-15 (Nev. 2007), *cert. denied*, 555 U.S. 847 (2008) (sustaining conviction of 20 counts of sexual assault when evidence established that the victim spent nearly every weekend with the defendant for several years and victim testified that abuse occurred almost every night she was there and further specified that the defendant touched her vagina with his finger more than 10 times and with his tongue more than 10 times); *State v. Hayes*, 914 P.2d 788, 795 (Wash. Ct. App. 1996) (holding victim's testimony that the defendant " 'put his private part in mine' at least 'four times' and some '[t]wo or three times a week' between July 1, 1990 and May 31, 1992" was sufficient to support conviction of four counts of rape of child).

¶ 66    Here, when we consider B.A.B.'s testimony at the adjudicatory hearing and the statements she made during the videotaped forensic interview together, the circuit court's finding that Johnathan T. sexually penetrated B.A.B. anally seven times and vaginally three times during the period of August 1, 2017, through November 18, 2018, was not against the manifest weight of the evidence. The State's petition for the adjudication of wardship alleged specifically which actions the State was charging. While testifying in court and during the videotaped forensic interview,

24

B.A.B. (1) described the acts committed with sufficient specificity to determine what offense had been committed, (2) described the number of acts with sufficient clarity to support each count alleged in the complaint or indictment, and (3) described the general period during which the acts occurred. Accordingly, the State's evidence was sufficient to establish that Johnathan T. committed the specific offenses alleged in all of the counts alleged in the State's petition. See *Letcher*, 386 Ill. App. 3d at 334.

¶ 67    Johnathan T. did not offer an alibi defense for the specific act alleged to have occurred in count I. Therefore, the date was not a material part of the offense charged, and Johnathan T. was not prejudiced by proof of a date range (August 1, 2017, through November 18, 2018) during which the 10 specific acts occurred. Accordingly, we cannot reverse Johnathan T.'s conviction on count I of the State's petition based on Johnathan T.'s insufficiency of the evidence argument.

¶ 68         D. Whether the Circuit Court Complied With the Juvenile Court Act in
                Sentencing Johnathan T. to the Department of Juvenile Justice

¶ 69    Finally, Johnathan T. argues that we should remand for a new dispositional hearing because the circuit court failed to comply with the requirements of section 5-750 of the Juvenile Court Act (705 ILCS 405/5-750 (West 2018)), when it sentenced him to the Department of Juvenile Justice. Again, we disagree.

¶ 70    Section 5-750 of the Juvenile Court Act sets out factors that the circuit court must consider and findings that the circuit court must make before sentencing a juvenile delinquent to the Department of Juvenile Justice. Specifically, section 5-750(1) provides that after a juvenile delinquent has been adjudicated a ward of the court, the circuit court may commit the juvenile delinquent to the Department of Juvenile Justice if the circuit court finds that

"(a) [the juvenile delinquent's] parents, guardian or legal custodian are unfit or are unable,

for some reason other than financial circumstances alone, to care for, protect, train or

25

discipline the minor, or are unwilling to do so, and the best interests of the minor and the public will not be served by placement under Section 5-740, or it is necessary to ensure the protection of the public from the consequences of criminal activity of the delinquent; and (b) commitment to the Department of Juvenile Justice is the least restrictive alternative based on evidence that efforts were made to locate less restrictive alternatives to secure confinement and the reasons why efforts were unsuccessful in locating a less restrictive alternative to secure confinement." *Id.* § 5-750(1).

¶ 71    Section 5-750(1) further provides that before "the court commits a minor to the Department of Juvenile Justice, it shall make a finding that secure confinement is necessary." *Id.* In making this finding, the circuit court must review the following individualized factors: the age of the minor; criminal background of the minor; results of any assessments of the minor; the educational background of the minor; the physical, mental, and emotional health of the minor; community based services that have been provided to the minor, whether the minor was compliant with the services, and the reason the services were unsuccessful; and services within the Department of Juvenile Justice that will meet the individualized needs of the minor. *Id.* § 5-750(1)(b)(A)-(G).

¶ 72    Although section 5-750 sets out seven factors that the circuit court must consider, the circuit court need not use any specific words when making its determination if the record demonstrates that the circuit court did consider the statutory factors. *In re Nathan A.C.*, 385 Ill. App. 3d 1063, 1077 (2008). In addition, the circuit court need not enumerate all possible alternatives when making a dispositional ruling, and the remarks of the judge can evidence a consideration of the factors necessary for a finding of secure confinement. *In re J.C.*, 163 Ill. App. 3d 877, 888 (1987). The purpose of having the circuit court review the seven individualized factors is to ensure that the circuit court is treating the Department of Juvenile Justice as a "last resort."

*In re Raheem M.*, 2013 IL App (4th) 130585, ¶ 53. Generally, our review of whether the dispositional hearing complied with statutory requirements is conducted under the *de novo* standard of review. *In re Justin F.*, 2016 IL App (1st) 153257, ¶ 25.

¶ 73    On appeal, Johnathan T. argues that the circuit court failed to properly consider the seven individualized factors, failed to properly determine that commitment to the Department of Juvenile Justice was the least restrictive alternative, and failed to determine that efforts were made to locate less restrictive alternatives to secure confinement and why the efforts were unsuccessful. Johnathan T. did not raise these issues in the proceedings below. The State, therefore, argues that Johnathan T. must establish plain error. We agree. See *In re Javaun I.*, 2014 IL App (4th) 130189, ¶¶ 38-39; *In re M.W.*, 232 Ill. 2d 408, 430-31 (2009) (applying plain error rule in juvenile proceedings).

¶ 74    The plain error rule allows a reviewing court to review a forfeited error affecting substantial rights under one of two alternative prongs: (1) the evidence is so closely balanced that the conviction may have resulted from the error and not the evidence or (2) the error is so serious that the defendant was denied a substantial right and a review of the forfeited error preserves the integrity of the judicial process. *People v. Herron*, 215 Ill. 2d 167, 178-79 (2005). Under both prongs the defendant has the burden of persuasion. *People v. Reese*, 2017 IL 120011, ¶ 69. If the defendant fails to carry his burden, the procedural default must be honored. *People v. Naylor*, 229 Ill. 2d 584, 593 (2008).

¶ 75    The first analytical step in plain error analysis is to determine whether there was a clear or obvious error at trial. *People v. Sebby*, 2017 IL 119445, ¶ 49. Absent a clear or obvious error, there can be no plain error. *Id.* ¶ 48. In the present case, no error occurred during sentencing.

¶ 76    Prior to the dispositional hearing, the probation department prepared, and circuit court reviewed, a social investigation report and a sex offender evaluation report. At the dispositional hearing, the circuit court also considered the testimony of Johnathan T.'s parents, the arguments of counsel, and the evidence that had been presented at the adjudicatory hearing. The circuit court, therefore, was aware of Johnathan T.'s age; physical, mental, and emotional health; substance abuse history; educational background; lack of prior criminal history; and the results of six different assessments contained within the reports.

¶ 77    At a sentencing hearing in a delinquency case, the circuit court must decide the "proper disposition best serving the interests of the minor and the public." 705 ILCS 405/5-705(1) (West 2018). In the present case, before committing Johnathan T. to the Department of Juvenile Justice, the circuit court found that Johnathan T.'s parents were unable to protect, train, or discipline him for reasons other than financial circumstances alone as required by section 5-750(1)(a). The court further found that secure confinement was necessary to protect the public from the consequences of respondent's criminal activity. The circuit court also found that the Department of Juvenile Justice was the least restrictive alternative "based upon the social investigation report and the sex offender report." The record supports these findings.

¶ 78    At the time of sentencing, Johnathan T. was 18 years old, and he turned 19 years old approximately three months after sentencing. The sex offender evaluation report suggested that Johnathan T. did not accept responsibility, did not want to change, had unhealthy levels of remorse and empathy, and seemed elusive and manipulative during the evaluation. The evaluator also noted that there was no sex offender treatment available in Massac County. The evaluator alerted the circuit court to outpatient treatment that was available in Troy and Marion, Illinois, and Paducah, Kentucky. The evaluator, however, found that Johnathan T. was "not safe in the community

28

without treatment." Therefore, the evaluator recommended a residential facility if Johnathan T. could not travel weekly. The circuit court, therefore, was presented with less restrictive alternatives to incarceration but rejected those alternatives, finding that Johnathan T. would get the treatment and counseling he needed at the Department of Juvenile Justice's Illinois Youth Center in Harrisburg, Illinois. See *Javaun I.*, 2014 IL App (4th) 130189, ¶ 43 (rejecting claim that circuit court failed to consider less restrictive alternatives where the trial court was presented with less restrictive alternatives to incarceration).

¶ 79    At the dispositional hearing, Johnathan T. did not identify any less restrictive alternatives to confinement that the circuit court failed to consider or identify any other community based alternatives to confinement that the circuit court could have reasonably imposed under the circumstances. While both of Johnathan T.'s parents and his attorney requested that the circuit court give Johnathan T. probation, as explained above, the circuit court relied on the presentencing reports and evaluations in rejecting probation as a less restrictive alternative. Although Johnathan T. did not have a history of any prior offenses, the sex offender evaluation concluded that Johnathan T. was "not safe in the community without treatment." The circuit court was entitled to rely on this evaluation in rejecting probation as a less restrictive alternative.

¶ 80    Under these facts, the court's failure to elicit further evidence from the parties regarding their investigation into less restrictive alternatives does not constitute clear and obvious error. *Javaun I.*, 2014 IL App (4th) 130189, ¶¶ 42-43. The circuit court was presented with less restrictive alternatives to incarceration in the sex offender evaluation report and by Johnathan T.'s parents and attorney, which the circuit court considered but rejected prior to committing respondent to the Department of Juvenile Justice.

29

¶ 81    The circuit court's order stated it considered each of the statutory factors. The statute does not require the circuit court to explicitly evaluate the individualized factors on the record. Instead, the statute provides that before the circuit court commits a minor to the Department of Juvenile Justice, it shall make a finding that secure confinement is necessary, "following a *review* of the following individualized factors." (Emphasis added.) 705 ILCS 405/5-750(1)(b) (West 2018). Therefore, in the present case, the only question is whether "the record contained sufficient information on these factors for the court to consider before sentencing [Johnathan T.]." *Javaun I.*, 2014 IL App (4th) 130189, ¶ 32. For the reasons we have explained above, the record contains sufficient information on the individualized factors. Accordingly, based on the record before us, we cannot say that the circuit court committed any error, much less plain error, during the dispositional hearing. The circuit court complied with the requirements of section 5-750(1)(b) of the Juvenile Court Act and did not abuse its discretion in sentencing Johnathan T. to the Department of Juvenile Justice.

¶ 82    Finally, we additionally note that, taking into account the nature of the offenses together with the effect of the circuit court's sentence, which cannot extend beyond Johnathan T.'s twenty-first birthday, the circuit court's sentence was clearly not excessive. Johnathan T. was three months shy of 19 years old when the circuit court sentenced him, and he was sentenced to an indeterminate amount of time in the Department of Juvenile Justice not to exceed his twenty-first birthday. Therefore, even if required to serve his full sentence, he would spend approximately 2 years in Department of Juvenile Justice for what would have otherwise been Class X felonies subject to sentences between 30 and 60 years for each offense and subject to mandatory consecutive

sentences for each offense. See 720 ILCS 5/11-1.30(d)(1) (West 2018); 730 ILCS 5/5-4.5-25(g), 5-8-4(d)(2) (West 2018).[2]

¶ 83   Considering that Johnathan T. committed 10 serious Class X felonies against B.A.B., we cannot conclude that serving a two-year sentence in the Department of Juvenile Justice was improper or excessive. Because the circuit court complied with the requirements of the Juvenile Court Act in sentencing a juvenile to the Department of Juvenile Justice, we cannot reverse the circuit court's sentence.[3]

¶ 84                                        III. CONCLUSION

¶ 85   For the foregoing reasons, we affirm the circuit court's adjudication of delinquency and sentence.


¶ 86   Affirmed.

---

[2]The offense of aggravated criminal sexual assault is a Class X felony. 720 ILCS 5/11-1.30(d)(1) (West 2018). However, in the present case, the State incorrectly charged the offenses as Class 1 felonies in its petition for adjudication of wardship. When the parties appeared in court for the dispositional hearing, the circuit court gave the State the opportunity to amend its petition to allege Class X felonies, but the circuit court stated that any amendment to the petition would require a continuance of the dispositional hearing. Rather than amend the petition and delay the dispositional hearing, the State stipulated to treating the offenses as Class 1 felonies for sentencing purposes.

[3]Illinois Supreme Court Rule 660A(f) (eff. July 1, 2013) mandates that this court file its decision within 150 days after the filing of the notice of appeal from a juvenile delinquency proceeding "[e]xcept for good cause shown." Both parties requested extensions of time to file their briefs, which were granted and which extended the briefing schedule beyond the due date for this decision. For this reason, there is good cause to issue this decision after the 150-day deadline.

**No. 5-20-0247**

| | |
|---|---|
| **Cite as:** | *In re Johnathan T.*, 2021 IL App (5th) 200247 |
| **Decision Under Review:** | Appeal from the Circuit Court of Massac County, No. 18-JD-5; the Hon. Todd Lambert, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Ellen J. Curry, and Eun Sun Nam, of State Appellate Defender's Office, of Mt. Vernon, for appellant. |
| **Attorneys for Appellee:** | Josh Stratemeyer, State's Attorney, of Metropolis (Patrick Delfino, Patrick D. Daly, and Sharon Shanahan, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |